Timothy Floyd CLITES, By His Father, Next friend and Legal Guardian, Keith Clites, and Keith Clites, Plaintiffs/Appellees/Cross-Appellants,

v.

STATE of Iowa, Iowa Department of Social Services, Glenwood State Hospital-School, Kevin J. Burns, Commissioner of Social Services, and William E. Campbell, Superintendent of the Glenwood State Hospital-School, Defendants/Appellants/Cross-Appellees.

No. 2–65599.

Court of Appeals of Iowa.

June 29, 1982.

Thomas J. Miller, Atty. Gen., and David Fortney, Asst. Atty. Gen., for defendant-appellant.

Lawrence Marcucci and David S. Wiggins of Williams & LaMarca, P.C., Des Moines, for plaintiffs-appellees.

SNELL, Judge.

Plaintiff, Timothy Floyd Clites, was born September 9, 1952. Since early childhood, Timothy had been diagnosed as mentally retarded due to an unknown prenatal cause. In 1963 Timothy was admitted to Glenwood Hospital-School, a large residential facility for the mentally retarded operated by the State of Iowa.

In 1970, approximately seven years after Timothy's admission to Glenwood, a change occurred in his treatment program. The use of major tranquilizers was prescribed to curb aggressive behavior exhibited by Timothy. From 1970 until 1975, Timothy received a myriad of different tranquilizers, administered in various combinations, under the auspices of several different physicians. In 1975, Timothy was diagnosed as suffering from tardive dyskinesia, a disease allegedly caused by long-term use of major tranquilizers. Symptoms of tardive dyskinesia include grimacing, chewing, tongue moving, blinking and abnormal movements of the limbs.

Timothy's father submitted a claim to the Iowa State Appeal Board in July of 1976 for damages arising from the negligent use of drugs and physical restraints on Timothy while he was being treated at Glenwood. A claim for damages was also made for violation of Timothy's civil rights. The Board failed to take action on the claim for six months nor had claimants filed a written

notice of withdrawal of their claim. On March 10, 1977, the present lawsuit was filed pursuant to chapter 25A, The Code 1975. On April 14, 1977, an appearance on behalf of all the defendants was made by the State Attorney General's office. An answer was filed on behalf of all defendants on May 2, 1977.

The trial to the court commenced February 14, 1980, and concluded on March 4, 1980. A ruling was filed August 7, 1980. The court concluded defendants had failed to provide reasonable medical treatment to Timothy in several different ways and that negligence was the proximate cause of Timothy's condition. An award to plaintiff was made for $385,165 for future medical expenses and $375,000 for past and future pain and suffering. Defendants appeal, claiming the district court (a) lacked subject-matter jurisdiction, (b) applied an incorrect standard of care in the use of physical restraints, in the administration of tranquilizers and on the issue of informed consent, and (c) awarded excessive damages unsupported by the evidence.

## I. Subject-matter Jurisdiction

Defendants argue the district court lacked subject-matter jurisdiction over plaintiff's claim since the appeal board had never finally disposed of the claim and the claimant-petitioner did not withdraw the claim from the board's consideration by filing written notice. Defendants rely upon section 25A.5, The Code 1975, which provides:

No suit shall be permitted under this chapter unless the state appeal board has made final disposition of the claim; except that if the state appeal board does not make final disposition of a claim within six months after the claim is made in writing to the state appeal board, the claimant may by notice in writing, withdraw the claim from consideration of the state appeal board and begin suit under this chapter. Disposition of or offer to settle any claim made under this chapter shall not be competent evidence of liability or amount of damages in any suit under this chapter.

Defendants cite *Charles Gabus Ford v. Iowa State Highway Commission*, 224 N.W.2d 639 (Iowa 1974), for the proposition that remedies before administrative agencies must be exhausted before the courts will act. While we agree with this proposition, we note that plaintiffs in *Charles Gabus Ford* failed to submit any claim to the State Appeal Board before commencing suit. Primary jurisdiction in the administrative agency was never established. In the case at bar, such is not the situation. The State Appeal Board had jurisdiction and failed to act for over six months. Defendants were not denied access to the administrative remedy by commencement of the case in district court. Unlike *Charles Gabus Ford*, we find no prejudice to their cause by plaintiffs' failure to formally withdraw their claim before the State Appeal Board. Service of notice of plaintiffs' suit constituted notice of withdrawal and substantially complied with the requirements of section 25A.5. *Cf. Carmichael v. Iowa State Highway Commission*, 156 N.W.2d 332 (Iowa 1968) (substantial compliance with notice requirement of the statute is needed to confer jurisdiction in district court in condemnation appeals).

## II. Standard of Care

There is no serious dispute regarding the standard of care owed to patients by hospitals and physicians. Doctors are held to such reasonable care and skill as is exercised by the ordinary physician of good standing under like circumstances. *Speed v. State*, 240 N.W.2d 901, 908 (Iowa 1976). Hospitals "should be held [to the standard of care] which obtains in hospitals generally under similar circumstances." *Dickinson v. Mailliard*, 175 N.W.2d 588, 596 (Iowa 1970).

Defendants argue, however, the trial court applied an incorrect standard of care in judging whether defendants' actions constituted negligence. Specifically, defend-

ants claim the standard of care with regard to the administration of tranquilizers and use of physical restraints utilized by the court did not reflect the industry standard but rather were the standards utilized by a particular practitioner or were standards not followed by many institutions. Defendants also claim an incorrect standard of care regarding informed consent was utilized by the court in finding negligence.

### A. Tranquilizers and Physical Restraints

The trial court made specific findings of fact regarding the industry standards for use of tranquilizers and physical restraints. Defendants contend those findings were not supported by the evidence. The evidence, defendants argue, established only the personal predilections of witnesses rather than the industry standard.

The trial court made the following findings of fact with reference to industry standards of care and defendants' violations of those standards:

1. The use of major tranquilizers (are) appropriate under limited circumstances. One justification for their use is to curb severe aggression and self-abuse. The experts testified the drugs should not be used to control sexual behavior. The court noted the record was devoid of evidence of the severe aggression or self-abuse required to justify the extent to which major tranquilizers were administered.

2. A patient subjected to the type of drug treatment Timothy was subjected to must be closely monitored. The industry standard establishes that regular visits by a physician, tests and physical exams are necessary to properly monitor a patient under these circumstances. The State did not comply with that standard of care as the record established Timothy was not regularly visited by a physician and physical exams had not been conducted for a three-year period. *Cf. Tomer v. Aiken,* 126 Iowa 114, 117, 101 N.W. 769 (Iowa 1904) (holding neg-

ligence could be predicated on failure to properly attend a patient needing treatment).

3. Temporary interruptions of drug therapy, *i.e.*, drug holidays, should be provided in cases like this to monitor the patient's progress while not under the effects of major drugs. Although there was some disagreement between plaintiff's and defendants' experts on the importance of drug holidays, the staff at Glenwood, without justification, ignored the known risks of uninterrupted use of major tranquilizers.

4. The failure of the Glenwood staff to react to Timothy's symptoms and alter his drug treatment program was substandard medical practice. Plaintiff's expert testified that the industry standard of care required the staff at Glenwood to react to symptoms of tardive dyskinesia, which should have been apparent. *See Speed v. State,* 240 N.W.2d 901, 905 (Iowa 1976) and *Dickinson v. Mailliard,* 175 N.W.2d 588, 590 (Iowa 1970) (negligent failure to properly diagnose may itself be malpractice on the part of the attending physician).

5. The industry standard of care required interim consultation of specialists between the time Timothy started the drug treatment program and its termination. Timothy's attending physician, being unfamiliar with tardive dyskinesia, should have sought consultations during the program; failure to do so was substandard medical care.

6. The practice of polypharmacy, the concurrent use of multiple drugs, was not warranted by industry standards given Timothy's status and the types of drugs involved. *Cf. Ronnie v. Klein,* 653 F.2d 836, 844–48 (3rd Cir. 1981) (the least intrusive means of treatment must be used, striking an acceptable balance between need for use of a psychotropic drug and the detriment to the patient to whom it is administered). The use of polypharmacy impeded the detection process of Timothy's growing problem and increased the likelihood Timothy's adverse reactions to the drugs would be more severe and permanent.

7. The use of major tranquilizers, in Timothy's case, was designed as a convenience or expediency program rather than a therapeutic program. This constituted substandard medical conduct.

8. The use of physical restraints on Timothy was cruel and inhuman.

There was some evidence the restraints were used to prevent self-abuse and as part of a program to modify Timothy's behavior. Timothy was shackled to his bed spread-eagle style on several occasions and was shackled another night until shift change for failing to keep shoes on his blistered feet. Although restraint may have been sometimes justified, the implicit thrust of the trial court's findings was that the physical restraint practice of the Glenwood staff was pursued for the convenience of the staff. Testimony of the Glenwood staff indicated few people knew of the formal Glenwood policy on physical restraints. Rather than being tailored to Timothy's therapeutic needs, the court concluded the physical restraint program was implemented for the staff's convenience, was cruel and inhuman treatment in several respects and fell below reasonable medical practice.

■ Our review under the Iowa Tort Claims Act is not de novo but is on errors of law assigned. We review the findings of fact made by the trial court to determine whether the findings are supported by substantial evidence. *Davis v. Jenness*, 253 N.W.2d 610, 614 (Iowa 1977). We view the evidence in a light most favorable to the trial court's findings. *Doggett v. Heritage Concepts, Inc.*, 298 N.W.2d 310, 312 (Iowa 1980).

■ Without detailing specific examples, each of the trial court's findings, summarized above, has support in the record. Expert testimony supports the court's findings on the industry standard for use of major tranquilizers, the effects of long-term and improperly monitored major tranquilizer drug treatment programs and on the use of physical restraints. There is testimony indicating the physical restraint program for Timothy was ridiculous. *Cf. Youngberg v. Romeo*, —— U.S. ——, at ——, 102 S.Ct. 2452, at 2458, 73 L.Ed.2d 28 (June 18, 1982) (where the United States Supreme Court held, in an action for deprivation of constitutional rights, an involuntarily committed patient's right to be free from unreasonable bodily restraint "always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." The Court also stated, "The [state] may not restrain residents [of an institution] except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training.) Although plaintiff's and defendants' experts' testimony was in conflict on some issues, the trial court is at liberty to "adopt in whole, in part or not at all," *Ehlinger v. State*, 237 N.W.2d 784, 792 (Iowa 1976), and to place appropriate weight upon each witnesses' testimony. *Heth v. Iowa City*, 206 N.W.2d 299, 302 (Iowa 1973). Testimony of experts, however, should not be arbitrarily rejected. *Eickelberg v. Deere & Co.*, 276 N.W.2d 442, 447 (Iowa 1979). The court in this case followed prescribed principles in weighing the testimony and deriving conclusions. We find substantial support in the record for the trial court's conclusions on standard of care and defendants' noncompliance with those standards.

**B. Informed Consent**

In *Rogers v. Okin*, 478 F.Supp. 1342, 1366, 1367 (D.Mass.1979), the court made the following comments on the constitutional dimensions of a patient's right to refuse mind-altering psychotropic drugs and the institution's duty to obtain a patient's informed consent prior to treatment:

The concept of a right of privacy also embodies First Amendment concerns. It is clear from the evidence in this case that psychotropic medication has the potential to affect and change a patient's mood, attitude and capacity to think. Such effects may well be considered by the medical profession as positive steps on the road to recovery and eventual

release from the hospital. But, the validity of psychotropic drugs as a reasonable course of medical treatment is not the core issue here. At stake is the more fundamental question as to whether the state may impose once again on the privacy of a person, already deprived of freedom through commitment by forcibly injecting mind-altering drugs into his system in a non-emergency situation.

The right to produce a thought—or refuse to do so—is as important as the right protected in *Roe v. Wade* to give birth or abort. Implicit in an individual's right to choose either abortion or birth is an underlying right to think and decide. Without the capacity to think, we merely exist, not function. Realistically, the capacity to think and decide is a fundamental element of freedom.

．　　．　　．　　．　　．

The concept of a therapeutic alliance between doctor and patient presumes a communication of information as to the pros and cons of a particular treatment program.

... [W]hile] the state may have an obligation to make treatment available, and a legitimate interest in providing such treatment, a competent patient has a fundamental right to decide to be left alone, absent an emergency situation.

 In *Grosjean v. Spencer*, 258 Iowa 685, 693, 140 N.W.2d 139, 144 (Iowa 1960), the court held a physician has the obligation to "make a reasonable disclosure to his patient of the nature and probable consequences of the suggested or recommended treatment." What is reasonable under the circumstances is to be determined by the factfinder. *Hepp v. Zinnel*, 199 N.W.2d 68, 69 (Iowa 1972). As a matter of law, hospitals are required to exercise that degree of care that other hospitals, under similar circumstances, generally exercise. *Dickinson v. Mailliard*, 175 N.W.2d 588, 596–97 (Iowa 1970); *Cf. Grosjean v. Spencer*, 258 Iowa at 691–94, 140 N.W.2d at 143–45. The precise degree of care and skill utilized by similarly situated hospitals is a factual question for the trier of fact. *Dickinson v. Mailliard*, 175 N.W.2d at 596–97. A plaintiff's failure to introduce sufficient evidence on the practice, obtaining generally, in similarly situated hospitals is fatal to an action for negligence. *See Freese v. Lemmon*, 267 N.W.2d 680, 688 (Iowa 1978).

 In this case, plaintiff's expert testified the standard practice, prior to administration of major tranquilizers, was to obtain a written informed consent from the patient or guardian. *Cf. Rogers v. Okin*, 478 F.Supp. 1342, 1362 (D.Mass.1979) (a patient, or the guardian if the patient is incompetent, has the right to make treatment decisions in nonemergency situations). Even the State's experts testified as to the evolution of need for written informed consent with respect to medications and regarding treatment for retarded persons. We are of the opinion there was substantial evidence in the record for the trial court to conclude that there is a recognized standard that requires some form of informed consent prior to the administration of major tranquilizers. *Cf. Rennie v. Klein*, 462 F.Supp. 1131, 1147 (D.N.J.1978) (In the context of due process, a patient has a right to refuse administration of medications, and "patients must be *informed* of and participate in the decision-making aspects of their treatment.") (emphasis supplied); *see also Davis v. Hubbard*, 506 F.Supp. 915, 938 (N.D.Ohio 1980) ("Neither the state's obligation to provide treatment, its interest in caring of its charges, nor any other interest justified the administration by the state of psychotropic drugs to competent patients at a mental institution, absent informed consent by the patient, unless the patient presented danger to himself or to others in the institution.") In *Davis*, the court determined the state should provide the patient with some kind of hearing before compelling the patient to take psychotropic drugs.

Timothy's parents were never informed of the potential side effects of the use, and prolonged use, of major tranquilizers nor was consent to their use obtained. *Cf. Rogers v. Okin*, 478 F.Supp. at 1366, 1367 (the decision to accept or refuse psychotropic medication is a basic right of privacy and the physician-patient relationship presumes the communication of the pros and cons of any particular treatment). The conclusion of the trial court that the industry standard

required Timothy's parents to be apprised of the dangers and benefits of the prescribed treatment program is supported by the record and is affirmed.

In 1969 Timothy's progress at Glenwood was such that "he was chosen as a model because of his good dressing procedures, good work habits, good social skills and good personality." In a letter the registrar so advised Timothy's parents and also stated it was necessary to have their permission to use Timothy's picture at a presentation. A form for this purpose was enclosed for Timothy's parents to sign and return. Thus, a perplexing contrast is presented as to what was deemed of sufficient importance to require consent. In any event, the staff at Glenwood either overlooked it or determined it was unnecessary to obtain consent to treatment.

■ There is no merit in the defendants' argument Timothy's parents impliedly consented to the treatment. Although Timothy's parents may have known Timothy was receiving medication, they were not informed of the risks attendant to the treatment program. *See Rogers v. Okin*, 478 F.Supp. 1342, 1368 (D.Mass.1979) ("the evidence must be clear that the patient understood [a right to refuse treatment] existed and then elected knowingly and voluntarily to waive such a right.") Since they were ignorant of the potential dangers of the program and of the precise medications being given to Timothy, there is no basis for saying they impliedly consented to the administration of major tranquilizers by their failure to object.

### III. Damages

■ Defendants claim the trial court's award of damages was excessive and unsupported by the record. Our review of the record, as it establishes Timothy's development before and after tardive dyskinesia began to develop, causes us to reject defendants' argument. Before Timothy was administered the major tranquilizers, he exhibited little aggressive or self-abusive behavior. Timothy could adequately communicate his needs to others, could dress himself, comb his hair, brush his teeth and make his bed. After the major tranquilizer treatment began, a marked change occurred. Timothy became aggressive and self-abusive. He began uncontrolled movements of his arms and legs. There is evidence of deterioriation in the results of Timothy's psychological summaries and IQ testing. His hygiene habits worsened. In the words of the trial court, Timothy was, after the effects of tardive dyskinesia manifested themselves, "only a fraction of his former self." We find substantial evidence in the record to support the trial court's award of damages.

In Timothy's present state, he requires constant attention at a projected cost as high as $6000 per month. The evidence is strong that Timothy's condition was caused by tardive dyskinesia induced by the negligent administration of major tranquilizers. The evidence supports the court's conclusion Timothy's status is permanent. Under the record presented, viewed in a light most conducive to upholding the judgment, *Wiles v. Myerly*, 210 N.W.2d 619, 632 (Iowa 1973), we conclude the award was supported by substantial evidence and was not flagrantly excessive. *See Holmquist v. Volkswagen of America, Inc.*, 261 N.W.2d 516, 524 (Iowa App.1979).

Plaintiffs contend the evidence clearly justifies a greater award for pain and suffering and future medical expenses. In *Kautman v. Mar-Mac Community School District*, 255 N.W.2d 146, 148 (Iowa 1977), the court stated:

> Although the evidence may have justified a higher award, such is not controlling. The determinative question posed is whether under the record, giving the jury its right to accept or reject whatever portions of the conflicting evidence it chose, the verdict effects substantial justice between the parties.

We think the trial court's award effected substantial justice between the parties. Accordingly, the judgment is affirmed.

AFFIRMED.