722 So.2d 302 (1998)
Lou Costanza ACCARDO, Oscar Joseph Accardo, Tammy Lynn Accardo and Rodney Joseph Accardo
v.
Dr. Louis CENAC a/k/a Dr. Phillip L. Cenac, Cenac/Davis Psychiatric Group, E.R. Squibb and Son, Inc. d/b/a Olin Corporation, (Manufacturer of Prolixin), Princeton Pharmaceutical Company (Distributor of Prolixin), Legion Insurance Company, The Louisiana Patients Compensation Fund, ABC Insurance Company, and XYZ Insurance Company.
No. 97 CA 2320.
Court of Appeal of Louisiana, First Circuit.
November 6, 1998.
*303 Kevin P. Landreneau, Daniel J. McGlynn, Christopher D. Glisson, Anthony M. Fazzio, Baton Rouge, Counsel for Plaintiffs Lou Costanza Accardo, Oscar Joseph Accardo, Tammy Lynn Accardo, Rodney Joseph Accardo.
Elaine W. Selle, New Orleans, Counsel for Intervenor Louisiana Patient's Compensation Fund.
*304 Elaine W. Selle, New Orleans, Bradley C. Myers, Baton Rouge, Counsel for Defendants Dr. Louis Cenac, Cenac/Davis Psychiatric Group, Legion Insurance Company.
Before LeBLANC, FOGG and PARRO, JJ.
LeBLANC, Judge.
This is a medical malpractice action in which the defendant, Dr. Louis Cenac, stipulated to liability and causation during the course of the trial, leaving only the issue of damages for the jury. The jury returned a verdict awarding the plaintiff, Lou Costanza Accardo, $100,000 in general damages, $25,000 in loss of income, $22,000 in past medical expenses, and $1,100,000 in future medical expenses; her husband, Mr. Oscar Accardo was awarded $50,000 for his loss of consortium, and the Accardo's two children were awarded $15,000 each for their loss of consortium. A judgment was rendered awarding the plaintiffs a total of $227,000. (As discussed more fully below, the $1,100,000 for future medical expenses was excluded from the judgment.) Plaintiffs sought an additur, and in the alternative, a new trial. The trial court granted plaintiffs' motion for additur, awarding an additional $150,000 in general damages. A reformed judgment increasing the damage award by $150,000 was rendered; this appeal, by the plaintiffs, Mr. and Mrs. Accardo and their two children, Tammy and Rodney, and the defendant/intervenor, Louisiana Patients' Compensation Fund (LPCF), follows.

FACTS
In short, as treatment for her paranoid schizophrenia, Mrs. Accardo received injections of Prolixin as prescribed and administered by Dr. Cenac over a period of five years, from October 1983 to August 1988. Prolixin is a neuroleptic drug known to cause the adverse side effect of tardive dyskinesia, a permanent and irreversible neurological disorder. In November, 1988, at the age of forty-three, Mrs. Accardo was diagnosed with severe tardive dyskinesia, contracted as a direct result of neuroleptic medication.

Factual Background
In 1970, Mrs. Accardo had a miscarriage. In 1974, she suffered an ectopic (tubal) pregnancy. Shortly thereafter, she began feeling depressed and after seeking counseling from a priest, she began experiencing auditory and tactile hallucinations taking the form of the priest touching her and being inside her head, talking to her. In 1979, approximately five years after the depression and hallucinations began, her family physician, Dr. Vincent Bella, referred her to the defendant, Dr. Louis Cenac, for psychiatric treatment. According to Dr. Cenac, he saw Mrs. Accardo twice in 1979, at which time he found her to be psychotic and laboring under delusions about a priest. During the second visit, Mrs. Accardo expressed a desire to be seen by a female psychiatrist; Dr. Cenac referred her to Dr. Jeanne Estes.
Dr. Estes diagnosed Mrs. Accardo with schizophrenia, paranoid type, and prescribed the neuroleptic drug, Haldol, (later switched to Mellaril) and Artane, for possible side effects from the neuroleptic drugs. Dr. Estes continued to treat Mrs. Accardo with the neuroleptic medications through 1981, during which time Mrs. Accardo continued to have hallucinations, thought disorder, and depression. In late 1981, due to a change in insurance coverage, Mrs. Accardo discontinued treatment with Dr. Estes and sought treatment at Stanacola Medical. There she was referred back to Dr. Cenac, who was a psychiatric consultant for Stanacola, for continued treatment for her "paranoid feelings."
Dr. Cenac examined Mrs. Accardo on September 14, 1981, at which time she complained of having an obsession that a priest had control of her mind, her thoughts were all jumbled up and she felt that the right side of her brain was blocked out. Dr. Cenac noted that Mrs. Accardo had not been taking the medicine prescribed for her by Dr. Estes. He administered psychological testing which revealed symptoms of schizophrenia and obsessive-compulsive disease, as well as signs of depression. Dr. Cenac diagnosed Mrs. Accardo with schizophrenia, paranoid type, and prescribed Triavil, which is a composite medication consisting of an antidepressant, to help control her moods, and a neuroleptic for *305 her schizophrenia. Dr. Cenac also referred her and her husband for supportive counseling. He saw her again in August, 1982, at which time she continued to have paranoid delusions and had quit taking her medication. He, again, prescribed Triavil and continued to see Mrs. Accardo.
In October, 1983, Dr. Cenac began treating Mrs. Accardo with a monthly dose of Prolixin Decanoate, a timed-release injection of another type of neuroleptic drug to help reduce the intensity of her hallucinations. She received her first injection of 1cc Prolixin on October 17, 1983, and continued to receive the same dosage on an approximate monthly basis[1] for the next five years. Dr. Cenac's medical record for Mrs. Accardo is scant;[2] however, it reflects that Mrs. Accardo's hallucinations, thought disorder, and depression continued throughout this time. He noted instances in which she developed some stiffness, which he diagnosed as "pseudoparkinsonian symptoms" (another known side effect of neuroleptic medications) for which he prescribed Artane. Mrs. Accardo received her last injection of Prolixin on August 4, 1988. Although Mrs. Accardo was diagnosed with severe tardive dyskinesia on November 28, 1988, Dr. Cenac testified that during the five years in which Mrs. Accardo came in for her injections, he did not note any signs or symptoms associated with tardive dyskinesia, even as late as November 1988. Nevertheless, on November 28, 1988, Dr. Cenac examined Mrs. Accardo and observed a "buccal, oral, [and] facial dyskinesia", which he diagnosed as tardive dyskinesia. In a letter, dated that same day, to Mrs. Accardo's general practitioner, Dr. Bella, Dr. Cenac noted, "I explained the gravity of the condition to her husband and that it may have been due to the major tranquilizers [which he testified were the neuroleptic drugs, including the Prolixin]." Dr. Cenac discontinued the Prolixin and prescribed Diazepam (Valium) to "calm her." In a letter to Dr. Bella dated December 2, 1988, Dr. Cenac noted the continuation of Mrs. Accardo's "buccal, oral and tongue movements" as well as "dyscontrol of her grimacing and eye movements," overall restlessness and hand wringing. Dr. Cenac did not see or treat Mrs. Accardo after December, 1988.
Subsequent to the tardive dyskinesia diagnosis, from 1989 to 1991, Mrs. Accardo required hospitalization on five separate occasions for her schizophrenia together with the tardive dyskinesia. Mrs. Accardo resumed treatment with Dr. Estes in August, 1990, and continuing through the date of trial.
The record contains evidence, particularly the testimony of Mr. Accardo, which provides much of the background information regarding the progression of Mrs. Accardo's condition, including her treatment by Dr. Cenac (which Mr. Accardo personally witnessed, as he accompanied his wife to her appointments). This evidence differs from the testimony of Dr. Cenac in several respects, particularly regarding the timing of Mrs. Accardo's outward symptoms, the frequency of the Prolixin injections, and the warnings and information about side effects given by Dr. Cenac. However, as discussed more fully below, the parties stipulated, mid-trial, to causation and liability; hence, it is unnecessary for us to address or resolve those conflicts in the record.

Procedural Background
The trial in this matter began on March 4, 1997 and concluded on March 13, 1997. The court adjourned for the day on March 12, 1997, during the cross examination of Dr. *306 Cenac. The next morning, the parties stipulated to Dr. Cenac's liability and causation of Mrs. Accardo's tardive dyskinesia and, with the consent of the parties, the trial court informed the jury as follows:
Ladies and Gentlemen of the Jury, Good morning to you.... Your task in this case has been simplified. You are no longer to consider the issue of liability or causation. Your function jurors from this point forward will be to consider the issue of damages to the plaintiffs only. Okay? All right.
The defense then completed putting on its evidence, and the issue of damages went to the jury. The jury returned its verdict; plaintiffs sought additur, which was granted, and the reformed judgment was appealed.

ADDITUR
Plaintiffs' appeal addresses alleged errors in the granting of the additur. Specifically, plaintiffs claim they had a right or option to decline the trial court's proposed additur and opt, instead, for a new trial, and the trial court's failure to allow them to exercise this option invalidates the additur. They also raise issues regarding the standard of review applicable to the trial court in granting or rejecting additur and to the court of appeal in reviewing the trial court's actions. Finally, they argue that upon granting additur, the trial court erred in assessing plaintiffs' damages at the "lowest possible amount" instead of making an independent "de novo" assessment of plaintiffs' damages.
The intervenor, LPCF, also appeals, and assigns error to the trial court's granting additur in spite of a jury verdict which was supported by the evidence and well within the jury's range of discretion. In answer to plaintiffs' appeal, LPCF maintains the trial court correctly substituted additur as an alternative to a new trial.

Right to Additur
La. C.C.P. art. 1814 provides for remittitur or additur as an alternative to a new trial as follows:
If the trial court is of the opinion that the verdict is so excessive or inadequate that a new trial should be granted for that reason only, it may indicate to the party or his attorney within what time he may enter a remittitur or additur. This remittitur or additur is to be entered only with the consent of the plaintiff or the defendant as the case may be, as an alternative to a new trial, and is to be entered only if the issue of quantum is clearly and fairly separable from other issues in the case. If a remittitur or additur is entered, then the court shall reform the jury verdict or judgment in accordance therewith.
Comment (b) to the above quoted article states that the purpose of this legislation is to serve judicial efficiency by allowing the parties to avoid a possibly unnecessary new trial and then to seek appellate review of the correctness of the judgment reformed by additur or remittitur. Although plaintiffs sought the additur, they maintain on appeal that they had the option to consent to the additur or to have a new trial. While we appreciate plaintiffs' contention that the article, particularly with respect to the consent requirement, is inartfully phrased, the jurisprudence is well settled that the Louisiana statutory scheme requires the consent of the party adversely affected by an additur or remittitur. That party is offered an opportunity, when asked by the trial judge, to agree to a change in judgment, thereby avoiding the expense and delay of a new trial. The order of an additur or remittitur is therefore contingent; if the party does not agree to the change, he elects to submit to a new trial. Miller v. Chicago Insurance Company, 320 So.2d 134 (La.1975). Thus, in this matter, since the plaintiffs moved for additur, the defendant is the party whose consent was required. If the defendant consents to the additur, thereby electing not to submit to a new trial, then the plaintiff may not seek a new trial on the sole ground that he is dissatisfied with the additur. His recourse is an appeal to this Court to review the award of damages. See Rougeau v. Commercial Union Insurance Company, 465 So.2d 178 (La. App. 3 Cir.1985); see also Bienvenu v. Dudley, 95-0547 (La.App. 1 Cir. 10/3/96); 682 So.2d 281, writs denied, 96-2661, 96-2673 (La.12/13/96); 692 So.2d 1069 and 1070.
*307 Although the record before us does not contain evidence of an official acceptance or rejection of the additur in the trial court by the defendant, we note that the judgment submitted by the defendant for the signature of the trial court contained the amount of additur, indicating that the defendant was willing to accept the additur rather than face the alternative of having the matter remanded to the trial court for the granting of a new trial. See, e.g., Palermo v. Lusignan, 482 So.2d 933 (La.App. 4 Cir.), writ denied, 487 So.2d 440 (La.1986). Furthermore, defendant's appeal on the issue of quantum is not indicative of an opposition to the additur. An appeal of a judgment reformed by additur is allowed by La. C.C.P. art.2083,[3] by either the party seeking the reformed judgment or the party adversely affected by the reformed judgment, even after having consented to such. Hodapp v. American Indemnity Company, 618 So.2d 32 (La.App. 3 Cir.1993); Karl v. Amoco Production Company, 492 So.2d 1279 (La.App. 3 Cir.1986). In such cases, the party is said to have consented under protest, thereby preserving its right to appeal. See, e.g., Fleming v. Smith, 93-488 (La.App. 5 Cir. 5/31/94), 638 So.2d 467; Richard v. Domingue, 542 So.2d 797 (La.App. 3 Cir.1989). Accordingly, the trial court did not act without authority in granting an additur, with the defendant's consent, and in denying plaintiffs' alternative request for a new trial. Further, the plaintiffs and the defendant both have the right to appeal the granting of the additur; thus, the appeal is properly before us.

Standard of Review
On appeal, the parties also dispute the standard of review imposed on the trial judge in reviewing a jury's verdict and determining whether additur is warranted. La. C.C. P. art.2083 was amended by 1989 La. Acts, No. 173, § 1 to add section (B) and specifically address the standard of review, as follows:
In reviewing a judgment reformed in accordance with a remittitur or additur, the court shall consider the reasonableness of the underlying jury verdict. (Emphasis added).
Prior to this amendment, the standard of review was articulated by the jurisprudence which contained conflict among the circuits. The amendment legislatively overruled jurisprudence holding that appellate review of a jury verdict reformed by an additur or a remittitur owed no deference to the jury verdict and was limited to the trial judge's great discretion. See Lougon v. Era Aviation, Inc., 609 So.2d 330 (La.App. 3 Cir.1992). Under the new standard of review, the appellate court should review the jury's award for abuse of discretion, and the trial court abuses its discretion in granting an additur or remittitur when the jury's award is within the range of discretion. Aycock v. Gulf Coast Transportation, Inc., 96-1471 (La.App. 3 Cir. 4/2/97), 692 So.2d 1334; Fleming v. Smith, 93-488 (La.App. 5 Cir. 5/31/94), 638 So.2d 467.

Assessment of Damages
Although the plaintiffs agree with the trial court's decision to grant additur, they contend on appeal that the trial court erred in using the appellate court's standard of review in assessing damages, i.e., raising the amount to the lowest amount a jury could have reasonably awarded, instead of assessing damages based on its own independent assessment of such, after having found the jury's award to be inadequate. Defendant, on the other hand, maintains that the jury's verdict was within the wide range of its discretion, and should not have been altered by the trial court. In any event, defendant maintains that, once altered by the trial court, the trial court did not err in limiting the amount of the additur to the lowest amount a reasonable jury could have awarded.
When a jury awards an amount that is lower than the lowest reasonable *308 amount, additur becomes proper. Once additur is determined to be proper, the amount awarded on additur should be raised only to the lowest reasonable amount; raising the amount awarded any higher than that is an abuse of the trial judge's discretion. Lennard v. State Farm Mutual Automobile Insurance Company, 26,396 (La.App. 2 Cir. 1/25/95), 649 So.2d 1114; Eddy v. Litton, 586 So.2d 670 (La.App. 2 Cir.1991), writ denied, 590 So.2d 1203 (La.1992); West v. Melancon, 507 So.2d 1250 (La.App. 4 Cir.), writ denied, 514 So.2d 128 (La.1987).
Accordingly, we must determine whether the jury's award of general damages was within its range of discretion. If the award was not within the jury's range of discretion, then the trial court did not abuse its discretion in granting additur. Furthermore, in reviewing the award of additur, we must determine if the amount awarded by the trial judge was the lowest amount that a jury could have reasonably awarded.

DAMAGES
The jury's verdict form awarded damages as follows:

Pain and suffering, past, present and $ 25,000
future:
Mental Anguish, past, present and future: $ 25,000
Medical Expenses, past and present: $ 22,000
Loss of Income and Earning Capacity: $ 25,000
Loss of enjoyment of life: $ 25,000
Disability, past, present and future: $ 25,000
Future medical care: $1,100,000
Oscar Accardo's loss of consortium: $ 50,000
Rodney Accardo's loss of consortium: $ 15,000
Tammy Accardo's loss of consortium: $ 15,000

A judgment was rendered adopting the jury's verdict, awarding the plaintiffs $100,000 against Dr. Cenac and his insurer, and awarding $127,000 against the defendant, LPCF. The future medical award of $1,100,000 was left out of the judgment. The trial court granted additur and rendered an amended judgment which increased Mrs. Accardo's pain and suffering award from $25,000 to $100,000 and increased Mrs. Accardo's mental anguish award from $25,000 to $100,000, for a total increase of $150,000.

Quantum
Both parties appealed the reformed judgment reflecting the additur. LPCF contends the jury verdict was reasonably supported by the record, and should not have been disturbed by the trial court; the Accardos maintain that, even with the trial court's grant of additur, the awards of general damages and loss of consortium remain "grossly" deficient. Plaintiffs also maintain the inadequacy of the general damage award is reflected by the incongruity of that award and the jury's award of over one million dollars for future medical care.

General Damages
We summarize Mrs. Accardo's tardive dyskinesia and the effects it has had on her and her family from facts revealed by the evidence introduced into the record at trial, including the testimony of the parties, witnesses, and experts, medical records and videotapes of Mrs. Accardo. Simply stated, tardive dyskinesia is an irreversible neurological movement disorder, which by definition, is drug induced, and for which there is no cure or effective treatment. In its mildest form, the disease causes abnormal mouth, tongue and facial movements. However, the disease is progressive and worsens gradually over time.
It is undisputed by the evidence that Mrs. Accardo's is an uncommonly severe case, causing the abnormal facial movements together with the neck pulling back, shoulders tense, abnormal gait in walking, abnormal movements of arms and legs, oral motor problems, constant motor dyscontrol performance, problems with lifting, carrying, ambulating, balance, climbing, and bending, and diaphragm control problems causing shortness of breath and "huffing and puffing." These abnormal movements have caused Mrs. Accardo burns and bruises, broken ribs and fluid swellings in her elbows and knees. At one point, her weight fell to eighty pounds and her family worried she might die. She has experienced dental problems as a result of the abnormal tongue movements and the teeth grinding.
Peggy Johnson, the Accardo's neighbor and mother-in-law to Tammy Accardo, described Mrs. Accardo's behavior after the contraction of tardive dyskenisia as "the most horrible, horrendous thing I had ever seen ... [I]t was just terrible ... [t]here is just no way, unles[s] you see it, that you *309 could comprehend." JoAnn Roussell, Mrs. Accardo's sister, when asked to describe her sister's condition, stated, "[I]t's almost undescribable [sic] ... [s]he used to pull her hair out, pull all her hair out ... her elbows... they had like swollen bumps on them because she would justshe couldn't keep still ... [s]he would just roll and roll and roll and roll on the floor." Tammy Accardo, Mrs. Accardo's daughter stated her mother's condition with the disease "was horrible ... [s]he bit her entire nail off her fingers, pulled her hair out, rolled on the floor ... [s]he couldn't eat." Mr. Accardo testified that the symptoms began with some stiffness, her hands contracted such that they became "squirrelly," then she started blinking and head bobbing, and the movements progressed to the point where his wife was "wild" and "begging for help." He testified that the movements made it very difficult for his wife to fall asleep (although they do not occur when she is sleeping) and described occasions when he would "lay on her and just take her hands and put them in my pants and just hold her down, and she finally would go to sleep."
The medical experts also were asked to describe tardive dyskinesia and Mrs. Accardo's condition. Dr. Estes, Mrs. Accardo's treating psychiatrist at the time of trial, described it as "frightening" and the worst case she has ever seen. Dr. William Edwin Fann described the condition as "bizarre and awful." Dr. Peter Breggin, a psychiatrist specializing in movement disorders explained that tardive dyskinesia is the movement disorder and it has components, all of which are a part of Mrs. Accardo's condition, including tardive dystonia, which is abnormal tone of the muscles causing spasms, and tardive akathisia, which is an "internal painful component" more fully described as:
"an inner feeling of irritation, all the way up to fairly extreme, like a torture that drives you to move. It drives you to move and move, and move. People will pace up and down; they'll run. In the extreme they'll fall on the floor and want to roll."
According to Dr. Breggin, the disease is catastrophic and the person with the disease is wholly aware of the abnormality of the movements and is driven by an attempt to overcome it and anxiety, which worsens the disease. Dr. Breggin testified that people with the disease tend to look "a bit crazy" and end up in a constant struggle "not to look crazy." Thus, according to Dr. Breggin, some of the movements may be "in desperation and just turmoil over the experience." Dr. Breggin testified that in severe cases, as Mrs. Accardo's, the movements cause extremities to start to "get frozen into place and become less functional."
At the time of trial, Mrs. Accardo had been suffering from the tardive dyskenisia for approximately eight years. Dr. Breggin performed an in-court examination of Mrs. Accardo which revealed the following:
We notice she's trying hard, but her gait has got a little funny bounce to it. And her husband, who I did ask to come up and stand here in case she falls ... she's not able to just move swiftly. She's not able because there's a spasm going on, and it's pulling her feet down and making her have that slightly odd looking walk. And you see that, you know, her mouth is opening and she's having trouble breathing. This is affecting her breathing, and its affecting her lips. Because stress, like being shown, will bring out some of the problems.... I'm not going to ask her to open up her mouth, because I think that's going a little too far. But if she opened up her mouth, you would see a tongue that is curling that she cannot control. Touching her shoulders, she is hot. This woman, she may not look it; she is as hot as if she had just run a marathon. She's sweating, because she is struggling not to show all of the stress that she is under.... Her shoulders feel so hard and tight because the spasms in here are pulling back her chin and then distorting her posture.... She can't sit still. Yesterday I was having her sit. And I said would you touch your nose? And the pelvic movements that she couldn't control were pushing her off of the chair.
We have viewed the videotapes of Mrs. Accardo that were introduced into the record at trial. The tapes reveal a woman in both physical and mental torture. The abnormal movements consist of arms flailing uncontrollably, *310 pacing, jerking, twitching, twisting and writhing. The worst of the tapes shows the type of behavior described by Mrs. Accardo's sister where she just "rolls and rolls" on the floor, writhing and twisting, in apparent agony. We viewed Mrs. Accardo's tortured attempts to talk, as well as the abnormal facial movements which prevent her from articulating what she is trying to convey. On one tape, it is apparent that Mrs. Accardo is uncomfortable about being taped, and attempts to control her movements, reflecting the awareness of her own condition described by Dr. Breggin as the "inner torture" component of the disease. After viewing the tapes, we agree with Peggy Johnson, Mrs. Accardo's friend and neighbor, that "there is just no way, unles[s] you see it, that you could comprehend." Further, we note that according to Mr. Accardo, Mrs. Accardo's condition as shown in the video tapes was "mild."
The evidence revealed that, prior to seeing Dr. Cenac in 1981, Mrs. Accardo had no signs or symptoms of a neurological disorder, as reflected by two neurological evaluations. Although she was experiencing auditory hallucinations as a result of her diagnosed schizophrenia, she did not require any hospitalizations prior to the tardive dyskinesia. In fact, the record reveals that even despite her schizophrenic condition, Mrs. Accardo led a functional and productive life"amazingly functional" according to Dr. Fann. Neither her own children nor Peggy Johnson, her neighbor, were aware of the mental problems she was experiencing as a result of the schizophrenia. Although she was a beautician, Mrs. Accardo was not employed during the marriage; she was a wife and mother. The record reveals that Mrs. Accardo played a very active role in the lives of her children and in their school activities. She was described as physically fine, extremely neat and well organized, and was considered by all who knew her to be a good housekeeper and mother. When asked if she had been a good wife, Mr. Accardo responded, "number one." Mrs. Accardo managed all of the family's finances, and the family frequently went on vacations, such as camping, fishing, and going to the beach, all of which were planned by Mrs. Accardo. However, since the tardive dyskinesia, Mrs. Accardo has been rendered totally and permanently disabled. As stated by her sister, Mrs. Accardo "can't do anything now." The record reveals that, now, there are times when Mrs. Accardo is unable to communicate with her family. Mrs. Accardo's condition, as shown in the videos, is painful for even an uninterested person to observe, far moreso for the family members closest to her, who must observe her on a regular basis. Finally, the record reveals that Mrs. Accardo's condition is often so bad that she literally begs her family members to help her. Unfortunately, there is no treatment or cure; her loved ones, who are helpless to her pleas, can do nothing to help her or ease her pain.
At the time of trial, Mrs. Accardo was a patient of Dr. Estes, who was treating her for both her schizophrenia and her tardive dyskinesia. She was back on neuroleptic drugs for the schizophrenia as well as the tardive dyskinesia. Although neuroleptic drugs cause tardive dyskinesia, they are also the only known treatment to suppress the symptoms of the disease. Dr. Estes and Mr. Accardo testified that the family made the decision to try the neuroleptics as a means of lessening the tardive dyskinesia symptoms because they were desperate. Even with the medications, Mrs. Accardo's condition is permanent and irreversible; there is no hope that she will improve, and the expectation is that it will worsen with age.
LPCF maintains that, despite the foregoing, the damages awarded by the jury were within its range of discretion. This argument is based on the fact that Mrs. Accardo, prior and subsequent to the tardive dyskinesia, suffers from schizophrenia, paranoid type. According to LPCF, "the jury correctly understood that the additional injury and damage caused to Ms. Accardo and her family as a result of her tardive dyskinesia was relatively slight in comparison to her long-standing, pre-existing psychiatric problems with schizophrenia." We disagree, as this is simply not supported by the record. The evidence overwhelmingly established that the mental disorder of schizophrenia does not cause any of the symptoms resulting from abnormal movements. The record firmly established *311 that the uncontrollable twisting, writhing, flailing, contorting, contracting, grimacing, etc. displayed by Mrs. Accardo are all components of the neurological disease and have nothing to do with her schizophrenia. Furthermore, the record clearly established that Mrs. Accardo was functional and productive prior to the onset of tardive dyskinesia despite the hallucinations and thought disorder occasioned by her schizophrenia. Remarkably, she was able to "hide" her schizophrenia from her two children and her friends and neighbors. Also, prior to the onset of tardive dyskinesia, Mrs. Accardo's schizophrenia did not require hospitalization; since the onset of the tardive dyskinesia, she has required hospitalization five times. Thus, the record does not support LPCF's contentions that the jury could have determined Mrs. Accardo's damages were due to the schizophrenia and not to the tardive dyskenisia.
LPCF also seems to argue that the damage award reflects the jury's consideration of the fact that, although the neuroleptic drugs caused Mrs. Accardo's condition, they were a necessary treatment for her schizophrenia. LPCF seems to argue that, somehow, this fact is the basis for a lower damage award. We dispose of this argument by citing the stipulation of liability and causation entered into by the parties during the trial. The record clearly reveals that the parties agreed to leave only the question of Mrs. Accardo's damages to the jury and accepted that Dr. Cenac's treatment of Mrs. Accardo caused her condition. Therefore, any argument relating to causation is inappropriate and irrelevant to the jury's verdict, and to this appeal.
Finally, LPCF contends that the jury's award is based on evidence in the record that Mr. Accardo told Dr. Robert Voogt, the plaintiffs' rehabilitation expert, that his wife's problems with tardive dyskinesia occur only "half" the time. In addition to being a mischaracterization of the testimony in the record, we find this argument to be without merit. A damage award is not metered on a daily basis. The award for pain and suffering, mental anguish, loss of enjoyment of life and disability is predicated on the totality of loss suffered by the plaintiffs as a result of Mrs. Accardo's condition. Despite the severity of the symptoms or level of disability displayed on any given day, Mrs. Accardo's tardive dyskinesia is a permanent, irreversible condition, the awareness of which the Accardos live with, and must accept every single day. Whether she is having a "bad" day or a "mild" day, because of her tardive dyskinesia, Mrs. Accardo will never be the same, and not a day goes by that this is not a reality to her and her family. Therefore, we reject LPCF's contention that the damage award should be lessened based on testimony that some days are not as bad as others.
We find that the jury's award of general damages was so deficiently low as to constitute an abuse of discretion; thus, the trial court's grant of additur was proper. We also find, however, that the additur's increase of $150,000 is also abusively low, as the total general damage award of $250,000 is lower than the lowest amount that could be reasonably awarded. In the absence of similar cases in Louisiana, our review of the jurisprudence containing awards for tardive dyskinesia provides guidance.
In Clites v. State, 322 N.W.2d 917 (Iowa Ct.App.1982) the court affirmed an award of general damages of $375,000 to a plaintiff with tardive dyskinesia as being within the range of the jury's discretion. We note that the plaintiff in Clites, prior to his contraction of the disease, was a mentally retarded patient at a residential facility for the mentally retarded.
In American Cyanamid Co. v. Frankson, 732 S.W.2d 648 (Tex.Ct.App.1987), a veterinarian suffered a generalized head injury, and was given neuroleptic drugs to treat the head injury. The drugs caused tardive dyskinesia and the court affirmed a jury's award of $750,000 for past damages and $1,000,000 for future damages. Although this amount includes a substantial lost past wages award, which is not found in the Accardo case, the extent of Frankson's tardive dyskinesia, described as drooling, marching, and pacing constantly, together with difficulty in eating and talking, appears to have been less severe than Mrs. Accardo's.
In American Physicians Insurance Exchange v. Garcia, 876 S.W.2d 842 (Tex.1994), *312 the court referred to an underlying judgment in the amount of $2,235,483.30 awarded the plaintiff for tardive dyskinesia. Because the case did not concern the merits of the original suit, there was no discussion regarding the plaintiff's dyskinesia.
The cases cited above provide some guidance figure for appropriate damages; however, they contain distinguishing facts from the case at hand (i.e., less severe damages, other pre-existing disabilities, and the lack of discussion regarding the severity of the condition). Therefore, although helpful, the damage awards in these cases do not provide us with a range of allowable damages. Our task is to determine the lowest amount of damages the jury could have reasonably awarded Mrs. Accardo based on the record. After a thorough review of the record and jurisprudence, we find that $1,000,000 is the lowest amount, in general damages, the jury could have reasonably awarded Mrs. Accardo.

Loss of Consortium
We also find that the jury's award of $50,000 to Mr. Accardo, and $15,000, each, to the two children, was an abuse of the jury's discretion. Thus, the trial court erred in not increasing those amounts by additur. Again, we may only increase these awards to the lowest amount that the jury could have awarded based on the record. The record reveals that, prior to the tardive dyskinesia, Mrs. Accardo, as a wife, was "number one" according to her husband. The family was very close and frequently went on vacations and outings such as camping and fishing. Mrs. Accardo played a very active part in the lives and education of her children. As the record reflects, Mrs. Accardo's condition prevents her from doing practically everything that she, and her family, used to enjoy. We find that the lowest reasonable award for their losses of consortium to be $150,000 to Mr. Accardo and $25,000, each, to the two children.

Medical Expenses Past and Present
Prior medical expenses in the amount of $23,714.58 were stipulated by the parties. The judgment, however, awards only $22,000. Plaintiffs request, and defendant does not object, that the judgment be amended to reflect the correct amount stipulated. Accordingly, the judgment is amended to increase the amount of medical expenses from $22,000 to $23,714.58.

Future Medical Expenses
The jury verdict awarded $1,100,000 to the plaintiffs for future medical expenses. This award has not been appealed as to necessity nor as to amount, i.e., sufficiency or excessiveness. However, in rendering judgment, the trial court omitted the future medical expenses award from the judgment, presumably pursuant to La. R.S. 40:1299.43. Plaintiffs argue that the omission of the future medical expenses award from the final judgment was erroneous and a violation of plaintiffs' constitutional rights. LPCF contends that the constitutional issue is not properly before this court because it was not heard and decided by the trial court.
La. R.S. 1299.43 provides that in medical malpractice claims which proceed to trial, the jury shall be given a special interrogatory asking if the patient is in need of future medical care and related benefits and the amount thereof. This provision was complied with in this case, and the jury returned a verdict finding the amount of Mrs. Accardo's future medical care was $1,100,000. This amount was included in the original judgment adopting the jury's verdict. However, after the trial court granted additur, and entered a reformed judgment reflecting the additional $150,000 for general damages, the future medical award was omitted from the judgment.
La. R.S. 40:1299.43 provides that medical malpractice victims may be awarded future medical care and related benefits, payable by the Fund, once a judgment is entered in favor of a patient who is found to be in need of the same. Payments for medical care and related benefits shall be paid by the patient's compensation fund without regard to the five hundred thousand dollar limitation imposed in La. R.S. 40:1299.42. La. R.S. 40:1299.43(D); Bijou v. Alton Ochsner Medical Foundation, 95-3074 (La.9/5/96); 679 So.2d 893. Our supreme court has held that the district courts are not vested with original *313 jurisdiction or decision-making responsibility over future medical care claims, finding that the statutory provisions of the Medical Malpractice Act vest exclusive jurisdiction over medical and related care claims with the Patient's Compensation Fund Oversight Board, the agency legislatively assigned to administer the Fund. Kelty v. Brumfield, 633 So.2d 1210 (La.1994). La. R.S. 40:1299.43(C) provides that once a judgment is entered in favor of a patient who is found to be in need of future medical care, the patient may make a claim to the patient's compensation fund through the board for all future medical care and related benefits.
In the instant case, the jury obviously found Mrs. Accardo to be in need of future medical care and related benefits, as reflected in its award of over one million dollars. Accordingly, we find the trial court erred in not including this finding in the judgment, so as to trigger the applicability of La. R.S. 40:1299.43(C). Thus, we amend the judgment to expressly find that Mrs. Accardo is in need of future medical care and related benefits.
Plaintiffs maintain that La. R.S. 40:1299.43, as it is applied to catastrophically injured persons violates equal protection and due process rights. This constitutional issue is not properly before us, as it was not addressed by the trial court. However, contrary to LPCF's contentions, the issue was raised and reserved by the plaintiffs. Plaintiffs filed an objection to the judgment language and/or content based on its contention that the judgment does not reflect the full judgment as awarded by the jury objecting "specifically, but not limited to, the award of future medical expenses is contrary to the Louisiana and United States Constitution." The trial court signed an order setting a hearing on April 21, 1997 to address plaintiffs' motion. The court minutes on that date reflect that "[c]ounsel for plaintiffs agreed to the [c]ontent of the Judgment, reserving his rights as to the Constitutionality of the way Future Medical Payments are made." Therefore, clearly the issue was raised below, and preserved by the plaintiffs. Accordingly, we remand for the limited purpose of the trial court conducting a hearing to address the constitutional issues raised by the plaintiffs. We note that our treatment of the appeal insofar as the general damage and loss of consortium awards have been amended and increased places plaintiffs in the posture of having a total amount which exceeds the maximum amount recoverable, exclusive of the value of future medical expenses, to which La. R.S. 40:1299.43(A)(3) is applicable.
For the foregoing reasons, the judgment of the trial court is amended to increase the general damage award to $500,000.00;[4] to increase the loss of consortium awards to $150,000.00 for Mr. Accardo and to $25,000.00 for each of the children; and to include in the judgment a finding that Mrs. Accardo is in need of future medical care. The judgment is affirmed as amended; and remanded for the limited purpose as stated herein. Costs of this appeal, in the amount of $5,259.09 are assessed to LPCF.
AMENDED, AFFIRMED AS AMENDED, AND REMANDED.
NOTES
[1] The parties dispute the actual frequency of Mrs. Accardo's injections. Dr. Cenac testified that he prescribed the injections on a monthly basis, but the Accardos did not come every month. The Accardos also testified that the injections were prescribed on a monthly basis, but they maintain that they went to Dr. Cenac's office every month for Mrs. Accardo to receive the injections. Dr. Cenac's medical record and notes are scant; even he admitted there were times when documentation was not made in the file; thus, the medical record does not provide an accurate account of the injections received by Mrs. Accardo, particularly in view of the billing information which reflects injections received by and charged to Mrs. Accardo which were not documented in her medical file.
[2] The record reveals that during the five-year interim of October 1983 and August 1988, when Mrs. Accardo was receiving the Prolixin injections, Dr. Cenac's medical record of Mrs. Accardo contains only three pages of handwritten notes.
[3] 1984 La., Acts No. 59 amended La. C.C.P. art.2083 to provide that an appeal may be taken "from a judgment reformed in accordance with a remittitur or additur under Article 1814." This change in the law legislatively overruled the holding in Miller v. Chicago Insurance Company, 320 So.2d 134 (La.1975), that a party accepting a remittitur or additur cannot thereafter appeal the issue of quantum.
[4] Although we find that $1,000,000.00 is the lowest reasonable amount awardable in general damages, plaintiffs' recovery is limited by the statutory cap of $500,000.00.