| LYDIE MOULDS AND RON MOULDS | * | NO. 2021-CA-0503 |
|---|---|---|
| | * | |
| VERSUS | | COURT OF APPEAL |
| | * | |
| LOUISIANA STADIUM AND EXPOSITION DISTRICT AND SMG | * | FOURTH CIRCUIT |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2016-04670, DIVISION "M"
Honorable Paulette R. Irons, Judge
\* \* \* \* \* \*
**Chief Judge Terri F. Love**
\* \* \* \* \* \*

(Court composed of Chief Judge Terri F. Love, Judge Dale N. Atkins, Judge Pro Tempore Lynn M. Luker)

**ATKINS, J., CONCURS IN THE RESULT**

Scott R. Bickford
Lawrence J. Centola, III
Jason Z. Landry
MARTZELL & BICKFORD, APC
338 Lafayette Street
New Orleans, LA 70130

AND

J. Lee Hoffoss, Jr.
Don McKnight
HOFFOSS DEVALL, LLC
517 W. College Street
Lake Charles, LA 70605

      COUNSEL FOR PLAINTIFFS/APPELLEES, LYDIE AND RON MOULDS

Jeff Landry
Attorney General
A. Mandina Babin
Assistant Attorney General, Lead Appellate Counsel
Wm. David Coffey
Assistant Attorney General, Appellate Counsel
Taylor M. Simon

Assistant Attorney General, Trial Counsel
LOUISIANA DEPARTMENT OF JUSTICE
1450 Poydras Street, Suite 900
New Orleans, LA 70112

      COUNSEL FOR DEFENDANT/APPELLANT, SMG

**AFFIRMED**

**MARCH 23, 2022**

*TFL*

*LML*

This appeal arises from injuries plaintiff allegedly sustained after tripping on a metal rod protruding from the concrete while walking from Superdome handicapped parking to the Superdome for a Saints football game. Plaintiff and her ex-husband contend that her traumatic brain injury and other injuries severely affected their lives and led to their divorce.

Following a trial, the jury found in favor of plaintiffs and against the company managing the Superdome, finding that the company had constructive notice of the defect. The jury awarded plaintiff $1,517,000.00 and $25,000.00 to her ex-husband for loss of consortium. The company managing the Superdome appealed, contending that the trial court erroneously denied a directed verdict on notice of the defect, the jury erred by finding it had constructive notice of the defect, and that the $1,300,000.00 general damage award was excessively high. Plaintiffs filed an answer to the appeal contending that the general damage award was inadequate.

Upon review, we find the trial court did not err by denying the directed verdict, as a reasonable person could interpret the evidence presented during the plaintiffs' case differently. The jury was also presented with juxtaposed expert

1

testimony concerning how and when the defect began to protrude from the concrete. As such, the jury did not commit manifest error by finding the managing company had constructive notice. The general damages award of $1,300,000.00 was not inadequate, excessive, or an abuse of the jury's discretion based on the evidence presented. Further, the trial court did not err by denying the request for judgment notwithstanding the verdict on general damages. The judgment of the trial court is affirmed.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On September 20, 2015, Lydie and Ron Moulds (collectively "Plaintiffs") parked on Level 3, Garage 1 in the handicapped parking area at the Superdome in order to attend a Saints football game. While Ms. Moulds was walking across the parking lot, she tripped over a piece of metal rod protruding from the concrete. Ms. Moulds fell, striking her head and various other parts of her body and broke her left elbow. She was examined by EMTs, but refused treatment and refused transportation to a hospital. As a result of the fall, Ms. Moulds contends that she suffered a traumatic brain injury, underwent ulnar nerve surgery on her left elbow, and could no longer function as her husband's primary caregiver, as he is wheelchair-bound. Ms. Moulds continues to cope with depression, anxiety, and various cognitive impairments, while also averring that the injuries led to her divorce from Mr. Moulds.

Plaintiffs filed a Petition for Damages against Louisiana Stadium and Exposition District[1] ("LSED") and SMG,[2] as the operations manager of the Superdome (collectively "Defendants"), seeking compensation for her injuries and

---

[1] A political subdivision possessing ownership of the Superdome.
[2] Now ASM Global.

Mr. Moulds' loss of consortium.[3]  Defendants filed a Motion for Summary Judgment contending that they had no actual or constructive notice of the defect and no notice of an unreasonable dangerous condition.  The trial court denied the Motion for Summary Judgment.

The matter proceeded to trial before a jury.  At the conclusion of Plaintiffs' case, Defendants filed two Motions for Directed Verdicts.  First, Defendants contended that Plaintiffs presented no evidence of past wage loss, future wage loss, or loss of earning capacity claims, thereby nullifying those claims.  Plaintiffs stipulated to same, and the trial court granted the directed verdict as to past wage loss, future wage loss, and loss of earning capacity.  Secondly, Defendants averred that Plaintiffs failed to satisfy their burden as to notice of the defect.  The trial court denied the second Motion for Directed Verdict.

At the conclusion of Defendants' case, Plaintiffs moved for a Directed Verdict regarding Ms. Moulds' comparative fault, which the trial court granted.  Plaintiffs then moved for a Directed Verdict averring that no evidence was presented to demonstrate that Ms. Moulds failed to mitigate her damages, which the trial court also granted.[4]  Plaintiffs then stipulated that neither SMG nor LSED had actual notice of the defect.

The jury found as follows:

1) SMG had constructive knowledge of the defect
2) LSED did not have constructive knowledge of the defect
3) SMG had a reasonable amount of time to cure the defect before fall
4) Lydie Moulds was injured as a result of the defect:
    Past medical expenses: $67,000.00
    Future medical expenses: $150,000.00
    Past pain and suffering: $100,000.00

---

[3] Plaintiffs divorced prior to trial.
[4] The trial court stated, "I agree with him," instead of explicitly stating she granted the directed verdict.

3

Future pain and suffering: $600,000.00
Loss of enjoyment of life: $600,000.00
Total for Lydie: $1,517,000.00
5) Ron Moulds suffered a loss of consortium
6) Loss of consortium: $25,000.00

The trial court entered the jury's verdict against SMG and awarded Ms. Moulds: $1,517,000.00, and Mr. Moulds: $25,000.00. Plaintiffs' claims against LSED were dismissed with prejudice. SMG was also found liable for costs, which were taxed at $43,917.99.00.

SMG filed a Motion for Judgment Notwithstanding the Verdict or, alternatively, a Motion for New Trial, based on liability and damages, which the trial court denied. SMG subsequently filed a Motion for Suspensive Appeal. Plaintiffs countered by filing an Answer to the appeal.

SMG asserts that the trial court erred by: 1) denying the Motion for Directed Verdict; 2) finding that Plaintiffs did not prove constructive notice of the defect; and 3) finding that the jury's general damages award was excessive and abusively high. Plaintiffs aver in their Answer to the appeal that the general damages award was insufficient.

### TRIAL TESTIMONY

#### Jason English

Jason English was qualified as an expert in safety engineering and tripping hazards. Mr. English testified anything over a quarter inch change in elevation is a tripping hazard and that the metal rod that tripped Ms. Moulds jutted approximately two inches above the concrete. He classified the metal rod Ms. Moulds tripped on as a tripping hazard and that SMG had a responsibility to have a safety program to identify hazards. Mr. English testified that it was difficult to determine how long the metal rod was sticking up from the concrete. However,

4

from looking at the photographs, he concluded that the metal rod was exposed for a "good period of time . . . months, possibly years." Mr. English believed that SMG should have seen the hazard if there was a policy in place that someone walk the parking lot once a month looking for tripping hazards.

When asked if he saw evidence of "management's commitment and employee involvement to safety," Mr. English testified that:

> At least from what I would consider a pedestrian safety relative to tripping hazards, I saw very limited commitment to that meaning that I did not see any evidence of any written policies procedures, written programs relative to identifying tripping hazards or even specifically conducting fall inspections to identify these types of hazards. No written program.
> Anything they had really was just verbal. It is unclear exactly we [sic] what was communicated because as these individuals pes [sic] would list out their job responsibilities and what they are supposed to be doing, it seemed like they safe never listed to identify trip hazards. That always had to be followed. Does that include doing this. Clearly that wasn't the forefront of their thought processes when they are seating there, what is job, what are you supposed to be doing and these inspections to identify fall hazards was never voluntarily listed until they were specifically asked about that. So that kind of goes towards the commitment and employee involvement. Relative to this particular issue, I did not see that commitment or involvement.

He further opined that SMG had neither an adequate training program to identify tripping hazards nor adequate hazard prevention and control standards or methods. Mr. English stated that falls are the leading cause of unintentional injury in the United States. He testified, "[b]ased on that that -- since that is going to be your largest cause of injury in this type of environment that should be an important aspect of your safety program from a prevention standpoint. In my opinion I do not see that in their program." Mr. English stated that a "see something, say something" policy was inadequate.

5

When cross-examined, Mr. English admitted that he could not "give you [sic] a specific time between 1975 and now as far as it that came into being," meaning when the metal rod became exposed. However, he reasoned that the metal rod was exposed for months or years because:

> [t]his particular wire that you can see in the photograph has what is referred to as a sleeve which is kind of the brownish yellowish color that is around the piece of metal rod. At one point that -- based on what I am seeing would be a flexible sleeve versus a hardened plastic like you think of PVC pipe. Based on what I am seeing as far as how it is flexing and the types of deformation that it has.
>
> So in my opinion because of the exposure particularly the UV degradation over time allowed that yellowish in color. Also it become more brittle which you can see at the top of that rod pieces of that sleeve that have broken off and separated from the sleeve itself.
>
> Another thing is that this goes down into the joint itself. It is believed to possibly be -- it actually goes into the concrete panel so if that was something that had just -- only way for that to get out -- if it was embedded down in that panel in that gap, it would have that sealant going on top of it. It would be hidden and protected by the sealant. The only way for it to get out from beneath would be to protrude up through that Elastomeric sealant that you see there.
>
> This sealant that has been there for a while. It is well skinned over; has some cracks that you see. And when it has been there for a while, it now has a dull appearance to it and weathered appearance. This is in on the top deck. It is going to get all that sun. It is not on a lower deck. As you can imagine in your own experience if you have ever dealt with, you know, caulking that has been exposed to -- if you were to have a fresh protrusion through that or a fresh cut into that caulk, you are now going to expose a more brightly colored whitish gray color.
>
> You don't see that anywhere around this rod. That would indicate it had come up through there. You would be able to see a more brighter or freshly indication of cuts in that caulk that would be evident from the coloration. We do not see that. Further which leads me to believe it is been in there for a good period of time because as you can see the caulk is -- kind of has the hole that the rod goes through it is kind of wallered out. It is larger. It is

6

not something that fits up tight to the metal rod itself indicating that the metal rod has likely been moving back and forth as cars go over it; or just general movement within the panels themselves over time which is kind of wallered out that hole to be a bigger.

You can imagine the Elastomeric sealant is pretty tough material so if something were to protrude and stick through it, it going to kind of come like a nail through caulk and likely to be very tight to it. So this is kind of loose meaning it is kind of wallered out from movement over time. To me those are all indications that it has been there for some time. There are markings on the concrete that you can see to the right as the way it is titled in that direction. You can see down there are some fresh markings on the concrete where it looks like maybe it was run over and pressed down but then had enough flexibility to it that it was able to not fully bend over and stay flat.

There are multiple things in this photograph that lead me to believe that it has been there -- I can't tell you the exact amount of time or the exact date that this may have happened. Given what I am seeing it is not something that just happened within hours or days. This is more something that has been there for months or longer.

At a minimum, Mr. English stated that the space should be inspected at least prior to each major event.

*Shana Holloman, M.D.*

Dr. Shana Holloman testified, via deposition, that she saw Ms. Moulds three times in 2017, after the Neurology Department referred Ms. Moulds to the Psychiatric Department, and that Ms. Moulds indicated she lost consciousness when she fell. Dr. Holloman diagnosed Ms. Moulds with major neurocognitive disorder without behavioral disturbances and a traumatic brain injury ("TBI"). Dr. Holloman stated that it was normal for patients with neurocognitive decline to suffer from depression. Dr. Holloman was unaware of Ms. Moulds having any previous psychiatric history and that Ms. Moulds stated she had a TBI.

*Mark Ladner, M.D.*

7

Dr. Mark Ladner testified, via deposition, that Ms. Moulds was hospitalized for depression and a suicide attempt. He had not seen her since her hospitalization. He stated that the major neurocognitive disorder was a contributing factor to Ms. Moulds' depression and memory loss. Dr. Ladner believed Ms. Moulds showed cognitive impairment. Dr. Ladner confirmed that a psychiatrist or neurologist can diagnose a TBI. Dr. Ladner stated that most TBIs resolve, but not all. Dr. Ladner commented on TBIs as follows: "I can tell you from my years of experience, you know, traumatic brain injuries are funny. You know, they're not all the same. I've never seen any two cases that looked alike. Sometimes you can do tests and see structural damage, sometimes you can't." Dr. Ladner saw no evidence of malingering in Ms. Moulds.

*Lydie Moulds*

Ms. Moulds, forty years old at the time of the fall, testified that she was her husband's caregiver at the time of the fall. She stated, "[w]e -- I remember walking with Ron. We were trying to catch up with our party, and the next thing I remember is I'm back in the car and I am hurt." Ms. Moulds stated she was "very, very confused and disoriented a bit. Yes, very confused." After being checked out, Ms. Moulds and her husband proceeded on to the football game. However, she testified that they left during the game. Ms. Moulds stated she laid down in her car while they waited for their friends to finish watching the game. That night, Ms. Moulds maintained she suffered from headaches, disorientation, and her elbow hurt. The next day, Ms. Moulds visited an emergency room, where she was diagnosed with an elbow fracture and a concussion.

Ms. Moulds testified she could no longer take care of the house or her husband, who is wheelchair-bound. She and her husband divorced shortly before

trial.  Ms. Moulds stated she can no longer live alone.  Ms. Moulds testified that her need for medical treatment persists.  Further, Ms. Moulds stated that she continues to suffer from severe nonstop headaches and migraines, memory problems, confusion, stress epilepsy, blacking out, bursts of anger, and sometimes forgets how she arrived somewhere.  When asked to describe her the confusion she experiences, Ms. Moulds stated:

> Well, there is different kinds. One of them is it is like waking up and you are at McDonald's you do not know how you got there. It is scary. You are there and you do not know how you got there or you in the store and you do not know who brought you there and why you there.
> You get blanks. I get blanks. People tell me you have said this and that like two hours ago. I have absolutely no recollection of it. To me it never happens. I also forget stuff. I cannot cook no more because I will forget stuff on the stove or leave the stove on. I have stress epilepsy which make me have blackouts. I forget the names of my loved ones when they come close to me. It is very isolating.

Ms. Moulds averred that she can no longer play the flute, requires transportation, and needs a new service dog.  Ms. Moulds contends she can no longer read for enjoyment and cannot work.  Ms. Moulds stated that her mental symptoms worsened over time.  She believes her condition is essentially the same as in 2018.  Ms. Moulds stated that she attempted suicide in 2018, and was involved in a singular motor vehicle accident in 2020, wherein she broke her back.

### Charles Bettinger, M.D.

Dr. Charles Bettinger, an economist and expert in statistics, testified, via deposition, that he was retained to calculate Ms. Moulds' future medical expenses. In doing so, Dr. Bettinger utilized the life care plan created by Bob Gisclair.  Dr. Bettinger's calculations were based upon the usual and accepted methodology and

included the following future medical expenses:

| | |
|---|---|
| Speech therapy: | $304.00 |
| Cognitive behavioral therapy: | $7,416.00 |
| Bloodwork (40 years): | $5,895.00 |
| Venipuncture (40 years): | $713.00 |
| SPECT brain imaging: | $1,333.00 |
| First set of medications for six years: | $16,337.00 |
| Second set of medications for 40 years: | $69,424.00 |
| Psychiatrist office visits for six years: | $9,684.00 |
| Neurologist visits for life (40 years): | $37,563.00 |
| TOTAL | $148,669.00[5] |

### Todd Cowen, M.D.

Dr. Todd Cowen, Plaintiffs' expert in physical medicine rehabilitation with expertise in the field of TBI, was asked to assist with preparing a life care plan for Ms. Moulds. Dr. Cowen met with Ms. Moulds in August 2018, and found her symptoms were consistent with a TBI. Dr. Cowen found that Ms. Moulds suffered blunt force trauma to the head, fractured her elbow, and required ulnar nerve surgery as a result of the fall. He diagnosed Ms. Moulds with a TBI, but stated that loss of consciousness was not required for a brain injury.

Dr. Cowen stated that Ms. Moulds suffered from TBI with neurocognitive issues, "symptoms of deficits, chronic posttraumatic migraines and tension headaches as well as secondary anxiety, depression, and insomnia." Further, Dr. Cowen characterized some of her symptoms as follows: "[s]he had fairly significant symptoms of depression and anxiety, panic attacks, nervousness that would typically make her headaches worse. Her headaches would make her anxiety and depression worse which is the common cycle we see." Dr. Cowen testified that this was "[s]omething I commonly see in people that have brain injury and chronic pain, chronic headaches." Dr. Cowen stated that Ms. Moulds should

---

[5] Dr. Bettinger stated that the total was $148,365.00.

continue to treat with medications, psychiatry, counseling, therapy, and cognitive rehabilitation. He testified that Ms. Moulds' condition was chronic and he did not believe it would resolve. He related these injuries and lasting symptoms as being causally related to the fall.

Dr. Cowen also collaborated with the life care planner, Bob Gisclair. When asked on cross-examination whether he believed Ms. Moulds was motivated by money, Dr. Cowen testified that he saw no evidence of malingering.

### *Bob Gisclair*

Bob Gisclair, who works in vocational rehabilitation and is an expert in the field of life care planning,[6] testified that he relies upon the opinions of physicians when he prepares plans. In preparing Ms. Mould's life care plan, he relied up recommendations from Dr. Cowen and Dr. Ladner. The costs he provided for future medical expenses did not include inflation. Mr. Gisclair's calculations were as follows:

| | |
|---|---|
| Speech therapy evaluation: | $304.00 |
| Cognitive behavioral therapy: | $7,416.00 |
| Bloodwork (40 years): | $7,539.40 |
| Medications: | $81,335.76 |
| Doctor visits: | $44,840.40 |
| TOTAL | $141,435.56 |

### *Ron Moulds*

Ron Moulds, Ms. Moulds' husband at the time of her fall, testified that he and Ms. Moulds had been divorced approximately two months at the time of trial because "things changed" after her fall. He has been one hundred percent disabled since 1992, and uses a wheelchair. On the day of Ms. Moulds' fall, Mr. Moulds stated that they parked in the handicapped parking area and he described the fall as

---

[6] Mr. Gisclair is a nationally certified life care planner.

follows:

> [w]e were trying to rush to get in there and get our seat. Not running, just walking a little faster than normal. She stepped -- there was a piece of rebar sticking up out of the parking lot about that tall. (Indicating.) It just so happened she stepped on it.
>
>        \*           \*           \*
>
> It went through her shoe into her foot and stopped her momentum. She fell forward and put her arm out and broke her arm. When her head – when she shit [sic] the concrete it sounded like a watermelon hitting the concrete. I thought she was dead. She laid there face down. I was scared [sic] touch her. She wouldn't respond to me. I bent down to shook [sic] her little bit. She did not move. She was out. When I turned her over her eyes were rolled back in her head.

He stated that she was not conscious. He said they continued on to the football game and stayed a "short time."

Ms. Moulds' headaches began "from day one." Mr. Moulds started noticing a change in Ms. Moulds "immediately." He stated that she misunderstood things and became angry. Mr. Moulds testified:

> I be sitting in the house on numerous occasions and she go outside and I look outside she be frozen out -- just be standing there in the yard. I call to her. She never move. She was having some kind of epilepsy or some kind of a form of epilepsy where she be frozen. She wouldn't know where she was. She did not even know who I was. I talk to her, let's go back in the house. She wouldn't move. She just stand there. I have to lead her back to the house and put her in the bed, pet her. Like I say she did not know who I was.
>
> Times we been to the Meridian to get something to eat at the Burger King or something and we be sitting there and Steve Mills happen to be there and we all go. She be sitting there kind of dazed. She said why are we here? How did we get here? What are we doing here. I tell her. Yes, that happened. She doesn't know where she was at or how she got there. That happened several times.
>
> Even at the house out in the yard. I let her driving a little bit at the time she call me did not know where she was at. She would be five, six miles from the house. I have to go find her; get her to tell me -- describe the area

where she was at. I might recognize and tell her which way to turn when she got to the road.

Ms. Moulds no longer cooked or cleaned after the fall. As to her increased anger and change in personality, he testified:

[s]he lose her temper and get made [sic] at me. I am the only person there. Got to take it out on somebody. I was scared she shoot me. I took my guns out the house. She wasn't Lydie no more. It wasn't no wife. It wasn't the woman I married. It was somebody else. I wish I would get her back. I know she never coming back from that. It got worse and worse and worse every year.

Not necessarily year to year. All during the year things would change in her mind. Our relationship changed. I still love her. I wasn't going anywhere. I was doing my best to support and take care of her console her, be nice to her, help her through it. That become an issue for her too.

Mr. Moulds further stated that Ms. Moulds would think people were judging her, she would soil herself, and was depressed all the time.

### *Daniel McIlhardy*

Daniel McIlhardy, the parking manager at the Superdome now and at the time of Ms. Moulds' fall, testified the parking lot where the Moulds' parked was open air with no roof and that the metal rod was a portion of highway mesh that was used to support the concrete when the concrete was poured. If the metal rod was protruding about two and a half inches from the ground, but was not supposed to be, Mr. McIlhardy agreed it would create a tripping hazard. Mr. McIlhardy agreed that SMG was responsible for making sure the parking garage was safe for fans. If an SMG employee witnessed the metal rod sticking out from the ground, then the employee should have gotten assistance to remove it.

At the time of the fall, SMG did not have a policy that required someone from the parking department inspect the parking lot every month for potential

hazards. Such a policy, however, was instituted in late 2015 or early 2016. As of September 2015, there was no policy to document a walk-through inspection in writing. The parking department would have walked through the parking garage the night before the Saints game to make sure everything is as it should be and afterwards to look for anything "out of the ordinary," any damage, anything safety related, or light outages.

Prior to Ms. Moulds' fall, the employees were not formally trained on how to look for tripping hazards. However, Mr. McIlhardy testified that:

> [i]t is common policy at the Superdome people are told if you come across something that is not safe or potentially dangerous it becomes yours. It is your responsibility to make sure it gets handled. I may not be the person with the broom and dustpan, but I am going to make sure that nobody drives through it gets flat tire or steps on it or anything like that anything until it is cleaned up.
> It basically becomes my responsibility I am walking through the hallway and somebody spills a beer on the floor. It becomes yours. It is not your department's responsibility but it is your responsibility as an employee it is yours.

Mr. McIlhardy stated that the housekeeping and engineering departments also work in the parking lots.

Mr. McIlhardy described the process of creating and complying with walk-through notes as follows:

> Prior to every event -- first, every event we have is assigned an event coordinator. They are the person that manages and makes your event happen with all of your wishes, decisions, options. The event coordinator is essentially the go between the client and the building and. A walk through is done prior to every event whether it is a birthday party or Super Bowl by the event coordinator and they walk all areas that are affected or within the perimeters of their event and make sure that everything is set up; everything is like it should be.
> If they ask for 20 chairs, they make sure there are 20 chairs there. If there is trash somewhere that did not

get picked up they -- it is a list of every defect that needs to be fixed whether it is lights not working or trash or there is not enough chairs or tables like they asked for. Things of that nature. It is done for every single event.

*      *      *

It is Word document. It is sent to every department as a whole. Like if there is a list of 20 items, they will send that out to all of us. Everybody sees everything. The reason for that is -- an event coordinator may mistake a responsibility and put it under my department, and it is not my department. It is this department.

So everybody reads those walk-through notes to ensure that the items listed under your department are taken care of and there could possibly be another item listed under public safety or housekeeping and you know it is not them so you take care of that too.

The parking lot where Ms. Moulds fell was used every day. Mr. McIlhardy had never before seen a piece of metal rod sticking up from the ground and has not since. His assistant manager arrived at the site of the fall and waited for someone to remove the metal rod with bolt cutters. Mr. McIlhardy acknowledged that the metal rod was a tripping hazard and did not think the hazard would be missed on a walk-through. Because of this, he did not believe the metal rod was exposed for a long period of time, but he admitted it could have been there ten years because he had no idea how long the metal rod was sticking up from the concrete.

While SMG did not have "specific training just for safety," Mr. McIlhardy stated they had "annual trainings twice a year that encompassed safety performance, hospitality, basically everything that falls underneath our umbrella for hosting events. Safety and patron safety are a huge part of that." There was no written safety training or manual given to parking employees.

### Sheria Griffin

Sheria Griffin worked as a security guard in the Superdome and testified that she was the report writer on the day of Ms. Moulds' fall. When she arrived at the

15

scene, Ms. Moulds was sitting on the curb and said she injured "her left elbow, right knee, left big toe, and laceration under her right foot." Ms. Moulds did not indicate to Ms. Griffin that she suffered a head injury, lost consciousness, felt dizzy, dazed, nauseous, or had a headache. Mr. Moulds' statement to Ms. Griffin did not mention a head injury either. Ms. Griffin's report documented that Ms. Moulds was examined by EMTs, but refused treatment and transportation to a hospital.

### Anson Chatman

Anson Chatman, a parking operations supervisor at the Superdome as of October 2016, testified that he had no personal knowledge of what occurred prior to October 2016. However, he assumed he was trained to follow the same procedures as those before him. He was trained to conduct walk-throughs monthly and before events to look for tripping hazards. He did not work in the parking lots at the time of Ms. Moulds' fall.

### Charles Bourg II

Charles Bourg II, the director of engineering operations at SMG (now ASM Global) was the facilities manager at the time of Ms. Moulds' fall. He stated that before every event, the general manager would conduct a walk-through. The "parking division will normally do inspections of the garage every day since they are there. We [engineering and operations] also conduct our own walk throughs as well." He testified:

> We are looking for any lights that might be out. We are looking for any defects in any rising of the concrete curve or anything like that that could be an impact to anybody entering into the garage. We also look at any of the sump pumps that are at the basement; if there is any issues with working condition because if it rains, you know, sometimes in the city the water does not

16

> get out quick enough. We do have some flooding in basement from time to time. We have to make sure those sump pumps are ready to get the water out.
>
> \*         \*         \*
>
> We are looking at the condition of the expansion joints. We are looking at any of the steps, any of the thresholds on the risers from the steps to see if any of that needs to be replaced. There were some times when we had to replace the treads on the stairs going up into the garage. We have had to fill some expansion joints that the filling may have fallen out of them. So we do look for a lot of different things. Sometimes it may be a cosmetic issue where we may need to restripe the parking lot itself so people can find the spot besides just changing lights and things like that.

Mr. Bourg conducted quarterly walk-throughs since November 2014.

Mr. Bourg stated that if his team would have seen the metal rod sticking up out of the expansion joint, then they "would have taken care of it immediately." He learned of Ms. Moulds' fall from the command post. Mr. Bourg never saw a metal rod sticking up from the concrete before this incident and has not seen it again since.

*Alan Stauder*

Alan Stauder, assistant manager of the parking department at the Superdome, testified that one of the primary safety policies he enforces is "see something, say something" and that employees attend annual training. He stated that if he had seen the metal rod protruding from the expansion joint, he would have contacted the engineering department immediately about the tripping hazard. After learning of Ms. Moulds' fall, he placed an orange cone over the metal rod and contacted command post so someone would remove the rod. He never saw a piece of metal like that sticking up from an expansion joint before the fall or after. Mr. Stauder agreed that SMG had a duty to ensure the parking garage was safe for fans.

17

*Laurie Ducros*

Laurie Ducros, the Superdome event services manager at the time of the fall, identified the walk-through notes from the Friday before the Saints game. In regards to training for walk-throughs, she stated that

> [i]t was basically when they trained us on the walk through they would -- it wasn't written. It was just our practical training. We would follow a coordinator throughout an event. All our new coordinators would shadow another seasoned coordinator. During events I would follow Ferro Bouton who [sic] the director of event services and what was also the coordinator for the Saints. He did a lot of my straining [sic].

Ms. Ducros had no specific knowledge about the metal rod.

*Daisy Langford*

Daisy Langford, the housekeeping manager at the Superdome and Smoothie King Center since 2007, testified that the team responsible for cleaning parking lots was trained to identify hazards. The employees "go to the training when they [sic] hired. We all do training as -- video training as far as what to look; as far as looking for stuff in the garages or outside or hazardous materials, anything that do a slip, trip, or fall." Ms. Langford stated that a class on slips, trips, and falls has been in place since 2007, and that everyone was trained to look for those types of hazards. There are members of the housekeeping department cleaning the parking lots every day unless there is no event on the weekends, then no one is there on the weekends. She stated that someone from housekeeping would have been in the parking lot the day before the Saints game.

*Michael Schilling*

Michael Schilling, the assistant general manager for ASM New Orleans (formerly SMG), testified that all departments are under his supervision and

explained the "see something, say something" policy as follows:

> [w]ell, one of the things we encourage all of our employees to do is to always look for safety issues and things that may not seem right. It could be a light out, suspicious person, and we ask them that while you are doing your job and moving about the campus if you see something that may not seem right to please bring it to your supervisor's attention so that we can with analyze it and address it appropriately. That system works very well during day to day and during our events.

He further elaborated on SMG's OSHA compliance thusly:

> [f]all protection which is one of the OSHA 30 requirements that we train all our personnel to make sure that our employees are taking the appropriate measures and are working safely. If they are working safely, if they are working in an area where there could be a fall hazard and then they also look for all of the areas that could potentially be a fall hazard for our employees and/or our guests that are attending events to make sure that those areas are safe and appropriate.
>
> &ast; &ast; &ast;
>
> Number 28 is slip prevention. Again that is part of the OSHA 30 best practices. We make sure that our staff is constantly walking and checking floors and stairs and other surfaces to make sure there are no slip hazards which would be spills or grease or other things and that again that it is for our employees and for our guests that are visiting our venue.

Overall, Mr. Schilling believes SMG takes safety seriously. When confronted with the report prepared in August 2015, that assessed the parking garage, Mr. Schilling stated he could not be sure that the expansion joint needing replacement was the same one where Ms. Moulds' fell.

### Matt Dauphin

The trial transcript reflects that Matt Dauphin's perpetuation video deposition was played for the jury. However, neither the video of the deposition, nor the transcript of the deposition was contained in the record. The trial transcript documents that Mr. Dauphin's report was introduced into evidence, however.

19

The August 14, 2015 report states that the parking "garage is structurally sound notwithstanding the conditions noted." The reports noted that an expansion joint needed replacing in Garage 1, Level 3.

***Leonard Quick***

Leonard Quick, an expert in civil, structural, and forensic engineering, testified that the metal rod was a specialized piece of coated mesh, referred to as highway mesh, and was utilized to take on the tensile stresses of concrete. Mr. Quick stated that he did not see anything that would have informed SMG that the metal rod was protruding from the concrete. He opined that the metal rod was only protruding for a few hours up to two days prior to Ms. Moulds' fall based on the vehicular load in the parking lot.

When asked about his conclusions regarding Mr. English's opinions, Mr. Quick stated that "[t]here was no scientific basis of fact for" Mr. English's "opinions that he expressed here at trial." He elaborated thusly:

> The first thing - the biggest thing is referring to what we call a sleeve. It is shown in the exhibit. I have seen it many times put up here. That sleeve is simply just a temporary protective cover at the end of the manufacturing process to protect the ends. And this is one of what we call the raw ends or manufactured end to protect that epoxy coating on the end for handling and shipping until the mesh is placed in place and ready to accept the concrete.
> As far as that material is concerned that is a plastic or PVC type of material very degradable. It has been in there exposed to air and less oxygen and moisture for -- since 1974 beginning of 1975 when the slab was placed in the Dome. That is anticipated expected to occur. That has no bearing whatsoever scientifically being able to date for a determination or opinion as to how long this piece of mesh was above the joint.

On cross-examination, Mr. Quick admitted that he speculated the metal rod was sticking out up to three days prior to the fall. Then he shortened his estimation

20

to about a day prior to the fall.  Mr. Quick explained the change in his opinion thusly:

> By the time of my deposition I testified about that question to you at most two to three days at the most. But going through all the testimony and hearing all of the testimony of all of the witnesses in the trial, that is going to have been hours, maybe a day but hours with the vehicular traffic.
>
> The forensic physical evidence and the way it is bent, the way the sheath shattered and there are a couple of pieces right there. This is a piece of the sheath. Wind, rain, vehicles continually to pass through here, parking stalls pull in, pull out. These material are going to crush and pulverize it to much smaller pieces and/or blow away with the wind. This is very, very light like a feather material. These are not going to hang around very - long at all.

### Dan Cliffe

Dan Cliffe, an expert in forensic accounting, testified that he examined Dr. Bettinger's report.  He stated that he could not determine whether Dr. Bettinger's report was accurate or inaccurate because Dr. Bettinger did not "really explain the methodology or how he is utilizing any assumptions what if -- even those assumptions may be for the most part."  Mr. Cliffe did not perform any life care plan calculations.

### Paul Harch, M.D.

Paul Harch, M.D., an expert in the assessment and treatment of neurological conditions and general medicine, categorized Ms. Moulds' brain injury as a mild TBI because she did not indicate that she lost consciousness in the emergency room.  Dr. Harch testified that Ms. Moulds' level of dysfunction was not consistent with someone who had a moderate or severe TBI.  As to a perceived gap in Ms. Moulds' neurological treatment, Dr. Harch opined:

> [w]ell, there was a period of time at least in my

21

review of the medical records and even in talking with her between October of 2015 and roughly April of 2016 when she had her surgery on her elbow where there was -- I did not see much in the medical records about complaints of neurological problems and many complaints that she had in here and it just -- there could be reasons for it. There was a gap in there and usually symptoms are persistent throughout in people who have persistent postconcussion syndrome.

However, Dr. Harch concluded that Ms. Moulds did suffer from post-concussion syndrome, but that

> [w]ell, the pattern of it is unusual in that you usually do not see an almost precipitous deterioration years afterwards. People have an injury; they have their postconcussion symptomatology and as we talked about most will resolve. But the people who do have persistence they will have some recovery over time but to have a late major deterioration was pretty unusual.
> There were parts of her exam that seemed, you know, like she was embellishing a little bit more. I felt she could have some residual from the accident, I thought it was out of proportion to her degree of injury. That was my general impression.

Dr. Harch observed that following when he met with Ms. Moulds:

> [w]ell, she appeared -- her affect was a little unusual in that most of the time she had her eyes closed talking to me, and I did not quite understand it because she wasn't photo phobic. It wasn't the fluorescent lights that were a problem to keep her eyes closed. She really could not remember much of anything when I tried to ask about history.
> There were -- from the time of the accident forward and in doctor's appointments that findings, details, there was almost nothing that I could rely on by history. As I said in the report I ended up having to go on at least for the history part of it most of -- or the details that were in the medical records that were submitted to me.
>     *    *    *
> Part of the exam you use that high intensity otoscope opthalmoscope to look in ears and eyes. I shined it in her eyes and people who are photo phobic they do not like it. They blink or they show some type of response. She did not do that. So I thought well photo

22

phobia is not the reason for that. Her eyes closed. It was just very unusual.

\*          \*          \*

Well, I recommended her continued care by her medical team and psychiatric support, but I also thought that cognitive therapy might help her micro-current electrical stimulation which is painless, a type of treatment for the brain has been shown to help anxiety and depression. Finally especially for her posttraumatic headaches that hyperbaric oxygen help her. Since that was one of that was one of the most responsive symptoms in the studies we have done with the patients I have treated with over the years.

Dr. Harch classified Ms. Moulds' speech as "very slow speech" and believed her condition was chronic. When asked if he thought Ms. Moulds was malingering, he stated, "I don't think it was an overt deliberate magnification but I thought that her presentation and complaints were a little exaggerated." However, in Dr. Harch's previous deposition, he testified that Ms. Moulds was not malingering. Dr. Harch opined that the treatment Ms. Moulds received thus far was reasonable and necessary due to the fall.

### Daniel Trahant, M.D.

Dr. Daniel Trahant, an expert neurologist, was retained "[t]o review the record and render an opinion as to what" he thought regarding the injuries sustained by Ms. Lydie Moulds. Dr. Trahant concluded:

Dr. Harch came to the same conclusion as did I - that the nature of her complaints and the extent of her complaints and duration of her complaints and the pervasiveness of her complaints meaning the depth of her complaints to the point she was nonfunctional for an extended period of time in view of the nature of her head trauma itself or facial trauma actually was inconsistent with an individual with a traumatic brain injury.

So the long-standing nature and the type of complaints she had was not typical of an individual that fell in the fashion that she did suffering an abrasion of her nose and/or on her initial presentation to Rush Medical Center said she did not lose consciousness and

23

was able to give an adequate history of her fall and the nurse, Ms. Tips who took the initial history, assessed her as being alert, cooperative with normal mental status and able to give a reliable history.

Then as time went on entered into the medical records and her second neurology visit at University Medical Center in Jackson it was a physician neurologist that saw her -- the name is difficult to pronounce for me but it was sheave –

*       *       *

Yes. All of a sudden, entered in the medical records was the fact that she lost consciousness. Ever since then that changed the diagnosis to a traumatic brain injury with loss of consciousness. And that element continues to appear for the next six years when actually within 24 hours of the accident she stated to the nurse at Rush Medical Center or emergency room that she did not lose consciousness. That she was -- I think the word was that she used when she talked to me and I think also the nurse was disoriented.

I am not sure what disoriented means in her use of that word. Now it may be she was stunned because she fell and was not sure why she fill. It could mean she was shocked that she fell. It could mean she was -- paid more attention to the fact that her nose was bloody and she was embarrassed. There are a number of different things disoriented can mean and not necessarily that she does not know where she was, who she was.

Then later in the medical records it shows up an inconsistency where she states she did not remember anything about the accident whatsoever, no recall. So there are number of inconsistencies as we go through the records, my records, Dr. Harch's records, and Dr. Manning's records in opposition to what the neurology records and psychiatry records at University Medical Center in Jackson. There is a great dichotomy and inconsistency from the initial relationship of her injury which is, in fact, the most reliable.

The closer you get to the actual event, the more reliable the history is. The further you get away from the actual event, then other facts start to creep in, and the facts are not as accurate as first related by an individual with a history of trauma. That is an extensive answer to your question. That sums up my thoughts.

Dr. Trahant stated that people with a concussion "[u]sually . . . improve over time,

not worsen with time. He believed Ms. Moulds "may have had a mild concussion

24

at best, at best [sic] but she did not have what I would term traumatic brain injury of any degree." Dr. Trahant testified that it "would be very, very unusual and atypical for a patient to have . . . innumerable symptoms and deterioration in cognitive or thinking about memory ability and have some such significant daily headaches of this type in view of the fact of the nature of her head injury."

On cross-examination, Dr. Trahant stated that he never met Ms. Moulds. Further, he testified that he was "not sure" Ms. Moulds suffered a concussion, but "[i]f she did [sic] it was a mild concussion." He explained this conclusion as follows:

> But the reason why I say that I'm not sure she did is because of the surrounding events that was described in the medical records by a Ms. Tips who was the registered nurse at Rush Emergency Room who took -- I testified to this earlier -- a history in preparation for her to be seen by Dr. Willis who was the ER physician on duty at the time.
>
> In any event as I testified earlier she, Ms. Tips, is an RN assessed her as being alert and oriented two all spheres and was for all practical purposes -- you get the idea that she was reliable Ms. Moulds. Then in her history that was obtained, Ms. Tips history that she obtained from the patient that described what had happened she fell and did not lose consciousness and then was disoriented.
>
> Again, I'm not sure what disoriented means. There are several possibilities of what she meant by that. It wasn't gone into it any further. Then later in the medical records she claimed to have lost consciousness for a minute or so. Then later in the medical records did not remember anything about falling. All that she remembered was that she was going to fall forward and was afraid she was going to hit her nose. Then did not remember anything else about the accident or injury.
>
> So there are inconsistencies there, but the way you diagnose a concussion is the nature of trauma, the -- what happens to the patient afterwards as far as their orientation level of alertness, level of responsiveness, any frank loss of consciousness and then what happens over the next 24 hour to several days.
>
> Typically a patient with a concussion will be --

> have some impairment of their level of their alertness, responsiveness, ability to answer questions, ability to give history, and to speak clearly and succinctly. Apparently that wasn't the case when she was at Rush Medical Center.

Dr. Trahant did admit that some individuals develop chronic problems from a concussion.

## *DIRECTED VERDICT*

SMG contends the trial court erred by denying the Motion for Directed Verdict, averring that Plaintiffs failed to meet their burden of proof that SMG had actual or constructive notice of the defect.[7]

This Court previously outlined the proper usage of a directed verdict as follows:

> A party may move for directed verdict at the close of evidence offered by an opponent. La.Code Civ. Proc. art. 1810. A directed verdict is proper when, considering all of the evidence in the light most favorable to the non-mover, it is clear that the facts and inferences point so strongly and overwhelmingly in favor of the mover that reasonable jurors could not reach a contrary verdict. *Davis v. Board of Sup'rs Louisiana State University and Agricultural and Mechanical College*, 2003–2319 (La.App. 4 Cir.11/17/04) 887 So.2d 722 (citation omitted). If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the case submitted to the jury. *Id.*

*Price v. Law Firm of Alex O. Lewis, III & Assocs.*, 04-0806, p. 2 (La. App. 4 Cir. 3/2/05), 898 So. 2d 608, 610.

Trial courts are vested with "much discretion" when granting or denying a motion for directed verdict. *Price*, 04-0806, p. 2, 898 So. 2d at 610. Appellate

---

[7] Plaintiffs stipulated prior to closing arguments that SMG did not have actual notice of the defect. Plaintiffs sought to provide proof of constructive notice only.

courts review a ruling on a directed verdict by determining "whether reasonable persons could not reach a contrary verdict under the evidence." *Id.* This Court explained:

> What this means is that the discretion of the trial court is really a discretion to deny the motion, not a discretion to grant the motion. In other words, it would not be error for a trial court to deny a directed verdict where reasonable men might disagree with the trial court decision to deny the motion for directed verdict, but it would be error to grant the motion where reasonable men might disagree with the decision to grant it.

*Wichser v. Trosclair*, 99-1929, p. 5 (La. App. 4 Cir. 2/28/01), 789 So. 2d 24, 27.

SMG asserts that the trial court erred because, when denying the directed verdict, the trial court judge stated:

> Right. First of all, guys, listen. I do not know why we did not have something to – I will let the jury decide. I think the argument is extremely strong. I really do. I think this is really not an accurate depiction of what it was that was sticking in the bottom of that ground that even if they did walk. My whole thing is -- you chose to have a jury. I will allow it to let them weigh it. You need to make your argument in closing but I do believe that is probably -- will be a charge.

Thusly, SMG contends "[t]he trial judge's oral reasons show that it improperly denied the Motion for Directed Verdict on the issue of notice simply because SMG requested a jury trial." SMG suggests that the trial court did not consider the merits. However, there is a "well-settled rule that the district court's oral or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment." *Bellard v. Am. Cent. Ins. Co.*, 07-1335, p. 25 (La. 4/18/08), 980 So. 2d 654, 671. As such, we will proceed with our substantive appellate review of the denial of the directed verdict.

In the Plaintiffs' case-in-chief, Mr. English, an expert in safety engineering

27

and tripping hazards, testified that the metal rod Ms. Moulds tripped on was a tripping hazard and that SMG had a responsibility to have a safety program to identify hazards. Mr. English concluded that the metal rod was exposed for a "good period of time . . . months, possibly years" and explained his reasoning. Mr. English agreed that SMG should have seen the hazard if there was a policy in place that someone walk the parking lot once a month looking for tripping hazards. Mr. English stated that a "see something, say something" policy was inadequate.

Mr. McIlhardy, the parking manager, stated that parking department employees would have walked the parking garages the day before the Saints football game looking for anything safety-related. He acknowledged that the metal rod was a tripping hazard and did not think the hazard would be missed on a walk-through. Because of this, Mr. McIlhardy did not believe the metal rod was exposed for a long period of time, but admitted it could have been there ten years because he had no idea how long the metal rod was protruding from the concrete.

We find that reasonable men could differ as to whether this testimony adequately presented evidence that SMG had notice of the defect. As such, the trial court did not err by denying SMG's Motion for Directed Verdict.

### CONSTRUCTIVE NOTICE

SMG asserts that the Plaintiffs failed to prove that SMG had constructive notice of the defect.

"A court of appeal may not set aside the jury's finding of fact in absence of 'manifest error' or unless it is 'clearly wrong.'" *Stamps v. Dunham*, 07-0095, p. 3 (La. App. 4 Cir. 9/19/07), 968 So. 2d 739, 742 (quoting *Stobart v. State through Dep't of Transp. & Dev.*, 617 So. 2d 880, 882 (La. 1993)). Appellate courts must make two findings to justify reversing the findings of a factfinder: 1) "find from

28

the record that a reasonable factual basis does not exist for the finding of the trial court"; and 2) "determine that the record establishes that the finding is clearly wrong or manifestly erroneous." *Stamps*, 07-0095, p. 3, 968 So. 2d at 743. If the factfinders' conclusions were reasonable, then they are not reversible. *Id.*

The Louisiana Supreme Court explained:

> because the factfinder is best aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said, when there is a conflict in the testimony reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.

*Housley v. Cerise*, 579 So. 2d 973, 976 (La. 1991). Further, we "must always keep in mind that 'if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Housely*, 579 So. 2d at 976 (quoting *Sistler v. Liberty Mutual Insurance Co.*, 558 So. 2d 1106, 1112 (La. 1990)). "Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Stobart*, 617 So. 2d at 883.

The trial court instructed the jury as follows:

> In order to find defendants liable for any damages to the plaintiffs, you must find that the defendants had actual or constructive knowledge, notice of the exposed metal and a reasonable opportunity to correct the issue before the injury occurred. Constructive knowledge in this case means the existence of facts which infer actual knowledge. There must be actual or constructive knowledge of an imminent dangerous condition.

"Constructive notice can be found if the conditions which caused the injury existed for such a period of time that those responsible, by the exercise of ordinary care

and diligence, must have known of their existence in general and could have guarded the public from injury." *Maldonado v. Louisiana Superdome Comm'n*, 95-2490, pp. 6-7 (La. App. 4 Cir. 1/22/97), 687 So. 2d 1087, 1092.

Mr. English concluded that the metal rod was protruding from the ground for a "good period of time . . . months, possibly years." He stated that SMG employees should have seen the hazard if there was a policy in place that someone walk the parking lot once a month looking for tripping hazards. Conversely, Defendants' engineering expert concluded that the metal rod protruded from the concrete a few hours or up to a day prior to Ms. Moulds' fall.

Mr. McIlhardy, the parking manager for the Superdome, testified that the protruding metal rod was a tripping hazard and did not think the hazard would be missed on a walk-through. The facilities manager at the time of Ms. Moulds' fall stated that walk-throughs of the parking garages would be conducted prior to every event. Further, the housekeeping manager for the Superdome testified that housekeeping employees responsible for cleaning the parking lots were trained to look for hazards. She also stated that housekeeping employees are cleaning the parking lots every day unless there are no events on the weekends.

Thus, the jury was presented with opposing expert conclusions as to how long the metal rod was protruding from the concrete and given information on how often the various departments and employees of SMG walk through the parking lots looking for hazards. This evidence demonstrated regular walk-throughs of the parking lots wherein SMG saw or should have seen the protrusion if the metal rod was there for any length of time. Accordingly, we do not find the jury committed manifest error by finding that Plaintiffs proved SMG had constructive notice of the defect. *See Rubino v. Louisiana Stadium & Exposition Dist.*, 619 So. 2d 738, 740

30

(La. App. 4th Cir. 1993) ("Plaintiff also carried her burden of proving that LSED had constructive notice of the defect as required by R.S. 9:2800. The evidence showed that LSED's employees made regular inspections of the area surrounding the stadium which LSED undertook to maintain. This area included the sidewalk where plaintiff fell.  In these inspections, maintenance personnel either saw or should have seen this elevation that caused plaintiff to fall. LSED had a reasonable opportunity to remedy the defect and failed to do so.").

### *GENERAL DAMAGES*

SMG maintains that the jury's general damage award of $1,300,000.00 was "excessive and abusively high under the facts and circumstances of this case." Conversely, Plaintiffs filed an Answer to the Appeal, contending that we should increase the general damages award to $2,400,000.00.

"General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty." *Bouquet v. Wal-Mart Stores, Inc.*, 08-0309, p. 4 (La. 4/4/08), 979 So. 2d 456, 458.  "[T]he injury sustained is not the sole factor for the determination of damages." *In re Med. Review Panel Boryca*, 20-0670, p. 10 (La. App. 4 Cir. 8/11/21), ___ So. 3d ___, ___, 2021 WL 3555967, *5, *writ denied sub nom. In re Med. Review Panel Proceedings of Boryca*, 21-01832 (La. 2/15/22), and *writ denied sub nom. In re Med. Review Panel Proceedings of Boryca*, 21-01825 (La. 2/15/22), and *writ denied sub nom. In re Med. Review Panel Proceedings of Boryca*, 21-01892 (La. 2/15/22).  Instead, "factors such as mental and physical pain and permanent disabilities must be considered in the determination of whether the trier of fact abused their discretion." *Id*.

Appellate courts review awards of general damages utilizing the abuse of discretion standard. *Bouquet*, 08-0309, p. 4, 979 So. 2d at 459. "The trier of fact is afforded much discretion in assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand." *Id*. We must first examine the facts and circumstances of the present matter. Then, "[o]nly if a review of the facts reveals an abuse of discretion, is it appropriate for the appellate court to resort to a review of prior similar awards." *Id*., 08-0309, p. 5, 979 So. 2d at 459.

Ms. Moulds testified that prior to her fall she was her husband's primary caregiver, but that her injuries now prevented her from caring for him. She stated that she and Mr. Moulds divorced. She underwent surgery on her arm due to the fall. Ms. Moulds continues to suffer from severe nonstop headaches and migraines, memory problems, confusion, stress epilepsy, blacking out, bursts of anger, and sometimes forgets how she arrived somewhere. Ms. Moulds can no longer play the flute, needs transportation, and a new service dog. Ms. Moulds contends she can no longer read for enjoyment and cannot work.

Likewise, Mr. Moulds stated that Ms. Moulds lost consciousness when she fell and noticed a change in his wife immediately. Mr. Moulds recounted how Ms. Moulds would forget where she was or how she arrived there, how her personality changed, how angry she was, and that she was no longer able to cook or clean.

During the trial, Dr. Holloman testified that she diagnosed Ms. Moulds with major neurocognitive disorder without behavioral disturbances and a TBI. Dr. Ladner stated that the major neurocognitive disorder was a contributing factor to Ms. Moulds' depression and memory loss. Dr. Ladner also found that Ms. Moulds suffered from cognitive impairment, but saw no evidence of malingering.

Dr. Cowen concluded that Ms. Moulds suffered blunt force trauma to the head, fractured her elbow, and required ulnar nerve surgery as a result of the fall. Dr. Cowen stated that Ms. Moulds suffered from TBI with neurocognitive issues, "symptoms of deficits, chronic posttraumatic migraines and tension headaches as well as secondary anxiety, depression, and insomnia." Dr. Cowen concluded that Ms. Moulds "had fairly significant symptoms of depression and anxiety, panic attacks, nervousness that would typically make her headaches worse. Her headaches would make her anxiety and depression worse which is the common cycle we see." He believed that Ms. Moulds' condition would not resolve and did not see evidence of malingering. Dr. Cowen related these injuries and lasting symptoms as being causally related to the fall.

Ms. Griffin testified that, when taking the report of Ms. Moulds, Ms. Moulds did not indicate that she suffered a head injury, lost consciousness, felt dizzy, or had a headache. Dr. Harch characterized Ms. Moulds' TBI as mild and stated that Ms. Moulds' level of dysfunction was not consistent with someone who had a moderate or severe TBI. He did believe that Ms. Moulds suffered from post-concussion syndrome, but thought she embellished her symptoms. Dr. Trahant generally agreed with Dr. Harch's observations and noted that Ms. Moulds did not report to the emergency room staff that she lost consciousness. Dr. Trahant did not believe Ms. Moulds had "what I would term traumatic brain injury of any degree." Dr. Trahant stated that Ms. Moulds' presentation and symptomology was unusual and opined that if she did suffer a concussion at all, it was mild.

Therefore, the jury was presented with juxtaposed expert testimony regarding the extent of Ms. Moulds' injuries and her continuing symptomology, weighed the evidence, and made credibility determinations. The jury awarded Ms.

Moulds $100,000.00 for past pain and suffering, $600,000.00 for future pain and suffering, and $600,000.00 for loss of enjoyment of life.  Given Ms. Moulds' relatively young age at the time of her fall, the fact that her condition is unlikely to resolve, and her continuing symptoms, we cannot conclude that the jury abused its vast discretion by awarding $1,300,000.00 in general damages.  The general damages awards "bear a reasonable relationship to the elements of proved damages." *Youn v. Mar. Overseas Corp.*, 623 So. 2d 1257, 1261 (La. 1993).

Because we find that the jury did not abuse its discretion in determining the amount of general damages, a review of prior similar awards is unnecessary.  *See Bouquet*, 08-0309, pp. 5-6, 979 So. 2d at 459-60 ("Only if a review of the facts reveals an abuse of discretion, is it appropriate for the appellate court to resort to a review of prior similar awards.").  However, a brief review supports our finding. This Court affirmed a general damages award of $4,750,000.00 for a man "diagnosed with a traumatic brain injury and a delayed-onset neurological syndrome with symptoms similar to amytrophic lateral sclerosis, or Lou Gehrig's disease" who also suffered from "post-traumatic stress disorder, major depressive disorder, pain disorder, and undifferentiated somatoform disorder." *Scarberry v. Entergy Corp.*, 13-0214, pp. 31-33 (La. App. 4 Cir. 2/19/14), 136 So. 3d 194, 214-15.  This Court also upheld a $40,000.00 general damages award for a non-displaced fractured elbow, "which was treated conservatively and did not require a hard cast." *Lino v. Allstate Ins. Co.*, 06-0166, pp. 8-10 (La. App. 4 Cir. 8/2/06), 937 So. 2d 888, 893-95.  The Second Circuit affirmed a trial court's award of $175,000.00 for a radial head fracture. *Locke v. Young*, 42,703, p. 22 (La. App. 2 Cir. 12/12/07), 973 So. 2d 831, 845.

As we found the jury's determinations reasonable, Plaintiffs' request for additur also lacks merit. *See Harts v. Downing*, 19-0620, p. 6 (La. App. 4 Cir. 6/24/20), 302 So. 3d 102, 109 ("'When a jury awards an amount that is lower than the lowest reasonable amount, additur becomes proper.'" (quoting Accardo v. Cenac, 97-2320, p. 9 (La. App. 1 Cir. 11/6/98), 722 So.2d 302, 307-08)).

### *JUDGMENT NOTWITHSTANDING THE VERDICT*

SMG avers the trial court erred by denying its Motion for Judgment Notwithstanding the Verdict on general damages.[8]

This Court previously outlined the standard for reviewing a JNOV:

> [t]he standard of review for a JNOV on appeal is a two-part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria, just as the trial judge does in deciding whether or not to grant the motion. After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. *Anderson v. New Orleans Public Service, Inc.*, *supra*, at 832. In reviewing a judgment notwithstanding the verdict, the appellate court must determine if the trial court erred in granting it. quoting *Anderson v. New Orleans Public Service, Inc.*, 583 So.2d 829 (La.1991); *Cormier v. McDonough*, 96–305 (La.App. 3 Cir. 10/23/96), 682 So.2d 814, 816. It is well settled under Louisiana jurisprudence that a JNOV is warranted when the facts and the inferences point so strongly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. *Delaney v. Whitney National Bank*, 96–2144, 97–0254 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, 717.

*Philips v. Berner*, 00-0103, p. 9 (La. App. 4 Cir. 5/16/01), 789 So. 2d 41, 47–48.

---

[8] SMG briefed the standard of review for a motion for new trial, but failed to brief issues relative to the trial court's denial of its alternative Motion for a New Trial. Pursuant to Rule 2-12.4, Uniform Rules – Courts of Appeal, any issues relative to the trial court's denial of the Motion for New Trial are deemed abandoned. *Murungi v. Touro Infirmary*, 12-0213, p. 3 n.2 (La. App. 4 Cir. 3/1/13), 110 So. 3d 1250, 1252 n.2; *Hymel v. Halmar, Inc.*, 532 So. 2d 851, 852 (La. App. 4th Cir. 1988).

As we found that the jury's determinations regarding general damages were reasonable in light of the facts and circumstances of this matter, we do not find that the trial court erred by denying SMG's Motion for Judgment Notwithstanding the Verdict on general damages.

## *DECREE*

For the above-mentioned reasons, we find the trial court did not err by denying SMG's Motion for Directed Verdict regarding notice because reasonable men could differ on their interpretation of the evidence of notice presented during Plaintiffs' case. Additionally, the jury was presented with opposing testimony concerning how and when the metal rod began protruding from the concrete. As such, the jury did not commit manifest error by finding constructive notice. The general damages award of $1,300,000.00 to Ms. Moulds was not inadequate, excessive, or an abuse of the jury's discretion based on the extent of Ms. Moulds' injuries and continuing medical condition. Further, the trial court did not err by denying SMG's request for JNOV on general damages. Accordingly, the judgment of the trial court is affirmed.

**AFFIRMED**